**William VELDHUIZEN and Audrey Veldhuizen, Plaintiffs,**

v.

**A.O. SMITH CORPORATION, A.O. Smith Harvestore Products, Inc., and Hawke & Company Harvestore, Inc., Defendants.**

Civ. No. 4–92–1131.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 14, 1993.

Charles Alfred Cox, Cox & Goudy, Minneapolis, MN, Ronald H. Schneider, Schneider Johnson & Bannon, Willmar, MN, for William Veldhuizen and Audrey Veldhuizen.

Blake Shepard, Jr., Frederick William Morris, John Walter Getsinger, Leonard Street & Deinard, Minneapolis, MN, David K. Schmitt, Katten Muchin & Zavis, Chicago, IL, for A.O. Smith Corp. and A.O. Smith Harvestore Products, Inc.

William N. Majerus and Lawrence J. Hays, Jr., & Assoc., Eagan, MN, for Hawke & Co. Harvestore, Inc.

### ORDER

DOTY, District Judge.

This matter is before the court on defendants' motion for summary judgment based on the applicable statutes of limitations. Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court grants defendants' motion.

### BACKGROUND

From 1955 to 1990, William and Audrey Veldhuizen ("the Veldhuizens") owned and operated a dairy farm near Woodstock, Minnesota. William Veldhuizen ("Veldhuizen") was responsible for the day-to-day operation of the farm. Defendant A.O. Smith Harvestore Products, Inc. ("AOSHPI") designs, manufactures and markets farm machinery and equipment, including Harvestore grain silos. AOSHPI is a wholly owned subsidiary of defendant A.O. Smith Corporation. Defendant Hawke & Company Harvestore, Inc. ("Hawke") is an authorized dealer of Harvestore silos. Harvestore silos are metal silos which are represented to protect stored grain from harmful oxygen through a breather air bag system. Based on representations of better feed, improved herd health, in-

creased milk production and lower costs, the Veldhuizens purchased or leased four Harvestore silos from Hawke between 1971 and 1979.

In 1970 or 1971, Pat Dougherty ("Dougherty"), a salesman for Hawke, visited Veldhuizen several times to try to sell him a Harvestore silo. To induce Veldhuizen to purchase a Harvestore silo, Dougherty allegedly made various statements regarding the capabilities of the silos. Veldhuizen was also provided with advertising and promotional material concerning the silos. The Harvestore silo was haled as the state of the art in feed storage systems. The Harvestore silo was described as an "oxygen free" and "oxygen limiting" storage structure that used breather bags to seal out oxygen and thus prevent spoilage which reduces the quality and nutritional value of stored feed. The preserving process of the Harvestore silo was likened to sealed canning or fruit jars.

Veldhuizen was told that the Harvestore silo would reduce spoilage and produce higher quality feed because oxygen would not come into contact with the feed during storage. Veldhuizen was told that about 20 percent of feed stored in conventional storage systems was lost to spoilage caused by oxidation. The Harvestore silo, however, was represented to cut the amount of spoiled feed to about 2 percent. Dougherty and the promotional items stated that the comparison had been verified by clinical tests. Veldhuizen was told that the better feed produced by the Harvestore silo would result in higher milk production. The Harvestore silo was reported to save money by eliminating the need to add protein supplements to feed. Veldhuizen was told that he would also save money through reduced labor costs. Finally, Veldhuizen was told that if he stored his feed in the Harvestore silo his cattle would be healthier and he would have lower veterinary bills.

Based on these representations, the Veldhuizens purchased their first Harvestore silo in 1971. After the sale, the Veldhuizens

were sent a monthly Harvestore farming magazine. The in-house magazine contained articles and advertisements which praised the virtues of the Harvestore silo system. Over the next several years, the Veldhuizens purchased three more Harvestore silos based on similar representations. In 1972, the Veldhuizens purchased a Harvestore silo to store high moisture corn. The Veldhuizens leased a third Harvestore silo in 1974 which they later purchased. In 1979, the Veldhuizens purchased a Harvestore silo to store ground ear corn.[1]

Veldhuizen first fed his herd haylage stored in a Harvestore silo in 1972. In general, the feed appeared to be of good quality. On occasion, however, Veldhuizen noticed some dark feed with traces of mold and small chunks of mold in the feed. Veldhuizen told Dougherty that he was finding mold in the feed from time to time. Dougherty responded that Veldhuizen could expect to get a layer of spoiled feed a few inches thick each time he opened the silo to refill the feed. Veldhuizen also had some trouble getting the feed out of the silo and Dougherty told him to lower the moisture content of feed put in the silo.

The first year Veldhuizen fed his herd haylage stored in the Harvestore silo milk production dropped. Veldhuizen estimated that the pounds of milk produced by the rolling herd was down to 12,500 from an average of 13,500. During that year, Veldhuizen did not add protein supplements to the feed. Initially the cattle did not respond to the alteration but within a year some cattle began losing weight. In subsequent years, Veldhuizen added varying levels of protein according to the advice of nutritionists. The amount of protein added to the feed was comparable to the levels Veldhuizen had been adding before he began feeding from the Harvestore silo.

Veldhuizen began using a second Harvestore silo in 1973 to store high moisture corn. Veldhuizen had no prior experience feeding or storing high moisture shell corn. The corn in general was of good quality. Near

---

1. The dimension of the silos purchased by the Veldhuizens varied. The first silo was 20' by 70'; the second silo was 20' by 32'; the third silo was 25' by 90'; the last silo was 20' by 80'.

the end of the feedstack, however, the corn was dark and moldy and had a strong, musty odor. Although only 50 bushels of corn had to be discarded, Veldhuizen estimated that 500 bushels had mold. Veldhuizen complained to Hawke about the moldy corn. Hawke indicated that the spoiled corn was a result of Veldhuizen opening the door for an hour or two to loosen the auger sweep during feeding. Hawke also suspected that air might be entering the silo through a loose door sealing and adjusted one lid of the silo. The next year, Veldhuizen put several hundred bushels of dry corn at the bottom of the silo to facilitate the auger sweep. Although the quality of the corn improved, each year the last 800 bushels of corn in the silo was darker, musty smelling and had visible traces of mold.

The Veldhuizens purchased a third Harvestore silo which they used to store haylage beginning in 1975. The feed was a little dark and of lesser quality than the feed produced by the 1971 Harvestore silo. In addition, the feed at the end of the feedstack was warm, darker and musty smelling with chunks of mold. When Veldhuizen reported the spoilage problem to the Harvestore dealer, he was told that air was probably getting in the silo through doors and hatches that were not shut tightly. The next year the Harvestore dealer resealed the Veldhuizens' silos but the quality of the feed did not improve.

Between 1972 and 1976, Veldhuizen's herd consistently produced around 12,500 pounds of milk annually. In 1976, there were no crops to harvest and store in the silos because of drought. Consequently, Veldhuizen had to buy feed for the herd during 1976 and 1977. Veldhuizen was surprised to find that milk production increased to 14,000 pounds that year. In 1977, Veldhuizen returned to feeding the herd haylage and corn stored in the Harvestore silos. The amount of milk produced by the herd tapered off over the next few years until it dropped below 11,000 pounds.

Veldhuizen had the feed tested and consulted nutritionists to attempt to curtail the herd's declining milk production. In the late 1970s, two dairy veterinarians, Doctors Lloyd Emond ("Emond") and John Paulson ("Paulson"), told Veldhuizen to quit using the Harvestore silos and to put the feed in a different structure. Based on their experience with other farmers, the doctors stated that dairy cattle fed out of Harvestore silos had more health and reproductive problems than cattle fed out of conventional silos. The doctors attributed low milk production, mastitis, cystic ovaries and hoof problems to the fermentation of feed stored in Harvestore silos. Although the biggest problem for the Veldhuizens was milk production, the herd also suffered from the other ailments observed by the doctors. The doctors concluded that the Harvestore silos were causing the problems but Veldhuizen did not believe them.

The Veldhuizens bought another Harvestore silo in 1979 which was installed in 1980 and used to store ground ear corn. The corn was good and fresh initially. Although there were few visible traces of mold, the last quarter of the feedstack was darker and a little musty. Veldhuizen told the Harvestore dealer that he was disappointed with the quality of the corn but he cannot recall the dealer's response. During the next year or so the silo never stood empty and was almost always full of corn. Veldhuizen noted that the quality of the corn improved and there was very little musty smelling corn.[2]

The Veldhuizens moved to Texas to farm dairy cattle in 1990 but their son continued to operate the farm in Minnesota. In the fall of 1991, Veldhuizen was told by his counsel that the breather bags in most Harvestore silos were inadequate to keep oxygen from the feed. After discovering the mechanism that caused the problems with the Harvestore silos, the Veldhuizens commenced this action on November 5, 1991. The Veldhuizens alleged fraud, negligence, breach of warranty, strict liability and violation of the Minnesota Consumer Fraud Law. Defendants have moved for summary judgment on the ground that the claims are barred by the applicable statutes of limitations.

2. The Veldhuizens abandoned this silo in 1982 in a bankruptcy proceeding.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which requires the trial court to direct a verdict if there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510–11.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in her favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, a verdict should not be directed. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### 1. Fraud Claim

Minnesota law is applicable in this diversity case. The applicable statute of limitations requires that an action for fraud be brought within six years from the date the cause of action accrues. Minn.Stat. § 541.05, subd. 1(6). The date on which fraud ought to have been discovered is subject to a standard of reasonableness. *Blegen v. Monarch Life Ins. Co.*, 365 N.W.2d 356, 357 (Minn.Ct.App. 1985). Under Minnesota law, the means of discovery are tantamount to actual discovery and "the facts constituting fraud are deemed to have been discovered when, with reasonable diligence, they could and ought to have been discovered." *Bustad v. Bustad*, 263 Minn. 238, 116 N.W.2d 552, 555 (1962). The failure to actually discover the fraud does not toll the statute of limitations if it is inconsistent with reasonable diligence. *Id.*

The Veldhuizens contend that the statute of limitations should be tolled because defendants concealed the fraud. Under Minnesota law, fraudulent concealment tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect. *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn.1990). The statute of limitations is tolled, however, "only if it is the very existence of the facts which establish the cause of action which are fraudulently concealed." *Id.* at 918–19 (citation omitted). Merely establishing that defendants intentionally concealed the alleged defects is insufficient; the Veldhuizens must prove that they were actually unaware that defects existed to show fraudulent concealment. *Id.* at 919.

The Veldhuizens carry the burden of proving that they did not discover the facts constituting fraud within six years before commencement of the action. *Blegen,* 365 N.W.2d at 357. They must also show that they could not have discovered the fraud through the exercise of reasonable diligence. *Id.* Finally, the Veldhuizens bear the burden of showing that defendants concealed the fraud and that the concealment itself could not have been discovered sooner by reasonable diligence. *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 795 (1975). The court recognizes that "normally in a statute of limitations context fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment." *Hines v. A.O. Smith Harvestore Prods., Inc.*, 880 F.2d 995, 999 (8th Cir.1989). Where the evidence

leaves no room for a reasonable difference of opinion, however, the court may properly resolve fact issues as a matter of law. *Miles v. A.O. Smith Harvestore Prods., Inc.,* 992 F.2d 813, 817 (8th Cir.1993).

■ Defendants contend the evidence unequivocally shows that shortly after the Veldhuizens began using their first Harvestore silo, they knew that the silos did not perform as represented. The evidence shows that the Veldhuizens knew almost from the start that the promised benefits which induced them to purchase the Harvestore silos did not materialize. The Veldhuizens knew that the amount of spoiled feed in the Harvestore silos was more than the promised two percent and that oxidation caused feed to spoil. Besides problems with feed quality, the Veldhuizens realized early on that other expected benefits of the Harvestore silos had not materialized. The herd consistently produced less milk once the Veldhuizens began using the Harvestore silos. The only year that milk production increased during the 1970s was in a drought year when the Veldhuizens did not feed the cattle grain stored in the Harvestore silos. Within a year of using the first Harvestore silo, the Veldhuizens knew that they could not eliminate protein supplements from the feed as promised. After the Harvestore silos were in use for a few years, it became evident to the Veldhuizens that the cattle were not healthier but had more health problems than in the past.

The Veldhuizens contend, however, that they were the victims of fraudulent concealment. The Veldhuizens claim that the magazine Harvestore provided to them, as well as advertisements in other farming magazines, concealed their cause of action from them. The Veldhuizens claim that post-sale articles and advertisements praising the oxygen-limiting benefits of the Harvestore silos prevented them from considering the silos as a potential source of their problems.[3] The court holds that because the materials did not conceal from the Veldhuizens the knowledge

that the silos were not performing as promised, there is no fraudulent concealment under Minnesota law. The court also notes that providing the Veldhuizens with the post-sale materials does not rise to the level of affirmative concealment necessary to toll the statute of limitations. *Accord Miles v. A.O. Smith Harvestore Products, Inc.,* 992 F.2d 813, 816 (8th Cir.1993) (applying Arkansas law).

The Veldhuizens also contend that defendants lulled them into believing that the Harvestore silos could be made to operate and perform as promised if properly managed. There is some evidence in the record to support that contention. Veldhuizen first noticed spoiled feed coming out of the Harvestore silo in 1972 and was allegedly told by Hawke that he could expect a layer of spoiled feed each time he opened the silo to refill. When Veldhuizen complained of moldy corn in the 1972 Harvestore silo, he was allegedly told by Hawke that the mold was a result of his leaving the doors open too long during feeding and filling. Veldhuizen told the Harvestore dealer that he was unhappy with the quality of feed produced by the 1974 Harvestore silo and the dealer allegedly said that air was probably entering the silo through doors and hatches that were not shut tightly.[4] The Veldhuizens contend that the statute of limitations was tolled by defendants repeatedly suggesting that the problems were caused by their management of the silo and its contents.

■ Based on the particular facts present here, however, the court need not decide whether the conduct relied on by the Veldhuizens raises a question of fact concerning fraudulent concealment. The court concludes that regardless of any concealment the limitations period began to run, as a matter of law, in the late 1970s when Doctors Emond and Paulson attributed the cause of the problems experienced by the Veldhuizens to the Harvestore silos. At that point, the

3. The materials contained representations similar to the ones that induced the Veldhuizens to purchase the Harvestore silos.

4. The Veldhuizens also contend that Hawke indicated resealing might solve the problems. The

silos were resealed in 1976 or 1977 but the quality of the feed remained unchanged. The evidence is undisputed that Veldhuizen knew the resealing and other efforts to remedy the situation in the 1970s did not cure the problems.

Veldhuizens were aware of facts sufficient to put a reasonable person on notice that a fraud claim may exist and, thus, had an affirmative duty to investigate. *Bustad,* 116 N.W.2d at 555. Although the Veldhuizens did not believe that the silos were the cause of their problems until their attorney told them so, the court concludes that through the exercise of reasonable diligence they could have discovered the alleged fraud and any concealment thereof well before November 5, 1985.[5]

Veldhuizen states that he considered the advice Doctors Emond and Paulson "radical" and did not take it seriously because they failed to explain exactly how the Harvestore silos caused the low milk production and other health problems. The statute is not tolled, however, simply because Veldhuizen did not give credence to the doctors' opinion. The doctors were unequivocal that the Harvestore silos were the source of the Veldhuizens' problems. The doctors explained in general terms that the problems were caused by fermentation of feed stored in the Harvestore silos. Veldhuizen knew that the doctors' opinion was based on their experience with other farmers who used Harvestore silos.

The date on which fraud, or the concealment of fraud, ought to have been discovered is subject to a standard of reasonableness. It cannot be said that a reasonable person would have disregarded the advice of Doctors Emond and Paulson as completely unfounded. To the contrary, a reasonable person armed with this information would suspect a claim for fraud may exist and investigate accordingly. Regardless of whether Veldhuizen believed Doctors Emond and Paulson, their opinion provided sufficient cause to investigate. Even assuming the defendants concealed the alleged fraud, the court concludes that the Veldhuizens have failed to demonstrate that the alleged concealment could not have been discovered sooner had they exercised reasonable diligence.

The Veldhuizens concede that they knew there was a connection between the problems with their herd and the feed. They contend that they did not identify the silos as the cause of the damage until meeting with their attorney in 1991. The Veldhuizens argue that until 1991 they thought they had the best feed storage system available and that the limitations period should not begin to run until they made a connection between the feed problems and the Harvestore silos. The limitations period does not wait to run until the Veldhuizens were able to make a causal connection between the failure of the silo to perform as promised and a particular design defect. *See Hydra–Mac,* 450 N.W.2d at 919. The court finds that the undisputed evidence shows that the Veldhuizens, by the exercise of reasonable diligence, should have realized by 1980 at the latest that defendants made false representations concerning the qualities of the Harvestore silos.[6] Accordingly, the court holds that the Veldhuizens' claim for fraud is time-barred.

## 2. Minnesota Consumer Fraud Law Claim

The Veldhuizens allege that defendants violated the Minnesota Consumer Fraud Law, Minn.Stat. § 325F.67. Defendants contend that the limitations period for the statutory consumer fraud claim began to run on the dates the silos were purchased by the Veldhuizens. The Veldhuizens insist, however, that their statutory fraud claim is governed by the same principles as their common law fraud claim.

The court concludes that Minn.Stat. § 541.05, subd. 1(2), which provides a six year limitations period for claims based on liability created by statute, applies to claims under the Minnesota Consumer Fraud Law. The court also holds that a cause of action accrues under the Minnesota Consumer Fraud Law on the date of sale when the alleged statutory violations occurred. *Accord. Agristor Leasing v. Meuli,* 634 F.Supp. 1208, 1218 (D.Kan.1986) (applying Kansas

---

**5.** The court accepts that the Veldhuizens did not have actual, subjective knowledge of the alleged fraud until near the time they filed suit.

**6.** The court has reviewed and considered the unpublished decision in *Buller v. AOSHPI, et al.,* C5–93–138, 1993 WL 413001 (Ct.App.Minn. Oct. 22, 1993). The court finds, however, that the instant case is distinguishable from *Buller.*

law). The court notes that subdivision 1(2) of Minn.Stat. § 541.05 does not include a discovery provision. The Veldhuizens purchased their Harvestore silos in 1971, 1972, 1974 and 1979. Accordingly, the court concludes that the Veldhuizens' claim for violation of the Minnesota Consumer Fraud Law is barred by the applicable statute of limitations.[7]

### 3. Strict Liability and Negligence Claims

The Veldhuizens allege that defendants are strictly liable for the alleged damages suffered by them. The Veldhuizens also claim that defendants negligently misrepresented the abilities of the Harvestore silos. The damages sought by the Veldhuizens under strict liability and negligence theories are economic losses arising out of a commercial transaction. The Uniform Commercial Code, not tort law, governs the rights and remedies of parties to commercial transactions. The Minnesota Supreme Court has made clear that:

> [E]conomic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the theories of negligence or strict products liability.

*Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159, 162 (Minn.1981).

The alleged damage to the Veldhuizens' silage and cattle is not "damage to other property" as contemplated by *Superwood*. *See Agristor Leasing v. Guggisberg*, 617 F.Supp. 902, 908 (D.Minn.1985). The Veldhuizens purchased the Harvestore silos to store feed for their dairy farm, a commercial operation. The substance of the complaint is that the Harvestore silos failed to perform as promised. The damages claimed resulted from the failure of the silos to function as expected; the losses sought represent the loss of the benefit of the bargain. *Id.* The court holds that, as a matter of law, the Veldhuizens' alleged damage is a non-recoverable economic loss which does not fall within the exception recognized in *Superwood*.

*Id.* Accordingly, the court concludes that the Veldhuizens' claims for negligence and strict liability cannot be maintained under Minnesota law.

Even if the Veldhuizens could maintain the negligence and strict liability claims, the court finds that the claims would be barred by the applicable statutes of limitations. *See* Minn.Stat. § 541.05, subd. 1(5) (six year limitations period applies to negligence cause of action); Minn.Stat. § 541.05, subd. 2 (four year limitations period applies to strict liability claim). The Veldhuizens contend that the statutes of limitations should be tolled based on fraudulent concealment. Because the Veldhuizens' claims for negligence and strict liability accrued at the latest by 1980, the court need not decide the issue. The court concludes that, regardless of the theory employed, the claims are barred by the statutes of limitations.

### 4. Breach of Warranty Claim

The Veldhuizens also seek to recover damages resulting from alleged breaches of express and implied warranties. A breach of warranty occurs when tender of delivery is made. Minn.Stat. § 336.2–725(2). A cause of action for breach of warranty accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *Id.* The longest period of repose that arguably applies to the warranty claims is four years. Minn.Stat. § 336.2–725(1) (four year limitations period applies to sales of goods). The Veldhuizens again urge the court to toll the statute of limitations based on fraudulent concealment. The court notes that any fraudulent concealment was discoverable by 1980 at the latest. Assuming without deciding that the limitations period was tolled until the fraud and its concealment was discoverable in 1980, the court nonetheless holds that the breach of warranty claims are time-barred.

### CONCLUSION

The court concludes that the Veldhuizens' claims for fraud, violation of the Minnesota

---

7. Assuming without deciding that the limitations period was tolled until the fraud and its concealment was discoverable in 1980, the court none-

theless holds that the claim for violation of the Minnesota Consumer Fraud Law is time-barred.

Consumer Fraud Law and breach of warranty are barred as a matter of law by the applicable statutes of limitations. The court also holds that under Minnesota law, the Veldhuizens' claims for negligence and strict liability cannot be maintained and, in the alternative, that the claims are barred by the applicable statute of limitations.

Accordingly, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment is granted and the complaint is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**