**Marvin KLEHR and Mary Klehr, Plaintiffs,**

v.

**A.O. SMITH CORPORATION and A.O. Smith Harvestore Products, Inc., Jointly and Severally, Defendants.**

**Civ. No. 3–94–424.**

United States District Court, D. Minnesota, Third Division.

Jan. 6, 1995.

James R. Koby, Parke O'Flaherty Heim Egan & Koby, La Crosse, WI, Charles Anthony Bird, Bird & Jacosbsen, Rochester, MN, William D. Mahler, Rochester, MN, James Anthony Vick, Malcolm L. McCune, Maddin Miller & McCune, Nashville, TN, for plaintiffs.

Gregg M. Corwin, Karin E. Peterson, St. Louis Park, MN, for William G. Olson.

Blake Shepard, Jr., Frederick William Morris, Leonard Street & Deinard, Minneapolis, MN, David K. Schmitt, Katten Muchin & Zavis, Chicago, IL, for A.O. Smith Corp.

Blake Shepard, Jr., Leonard Street & Deinard, Minneapolis, MN, for A.O. Smith Harvestore.

Frederick William Morris, Leonard Street & Deinard, Minneapolis, MN, for A.O. Smith Harvestore Products, Inc.

William Scott Partridge, Farrish Johnson & Maschka, Mankato, MN, for MVBA Harvestore Systems.

## MEMORANDUM OPINION
## AND ORDER

DAVIS, District Judge.

### *INTRODUCTION*

This action arises out of plaintiffs Marvin and Mary Klehr's purchase of a Harvestore silo in July, 1974. Plaintiffs claim that Defendants misrepresented material facts with respect to the characteristics of the Harvestore silo, causing the Klehrs damage. Before the Court is Defendant A.O. Smith Harvestore Products, Inc.'s ("AOSHPI") motion for summary judgment on all of Plaintiffs' claims based upon the expiration of the applicable statutes of limitations. Defendants argue that the action is time-barred because Plaintiffs failed to commence their lawsuit until August 23, 1993, nineteen years after purchasing the silo. For the following reasons and based upon all records, files and proceedings herein, Defendant's motion for summary judgment will be granted.

### *FACTUAL BACKGROUND*

#### I. Plaintiffs' Purchase of the Harvestore Silo

The Klehrs purchased a $25 \times 80$ foot Harvestore silo on July 15, 1974, and began to use it in the summer of 1975.[1] The Klehrs stored chopped alfalfa haylage and occasionally silage in the silo. Richard Deutsch, a salesperson for MVBA Harvestore Systems, sold the silo to the Klehrs. Deutsch supplied the Klehrs with literature and films representing the qualities and benefits of the Harvestore silos. The Klehrs claim that they purchased the Harvestore based upon the following representations:

1. That A.O. Smith Corporation was a one-hundred year old company that "backed" the product and that AOSHPI was twenty-five years old and had the backing of A.O. Smith;

2. That MVBA Harvestore Systems representatives were authorized Harvestore dealers and were the repository of all research regarding the Harvestore silos;

3. Because of a unique "oxygen-limiting" breather bag, no oxygen would contact the feed during storage, resulting in better feed quality;

4. Because oxygen would not contact the feed, there would be no spoiled and moldy feed from the Harvestore silo;

5. Because of the higher quality feed, Plaintiffs would have healthier cows, realize an increase in milk production of three to five pounds per cow per day, and be able to significantly reduce or eliminate the protein supplements in their rations; and

6. Plaintiffs would realize more profits and as a result the silo would pay for itself in four to five years.

Marvin Klehr ("M.K.") Dep. at 149–169, 183, 611–12. All of the promised benefits stemmed from the oxygen-limiting feature, which constituted the most important factor in the Klehrs' decision to purchase the Harvestore silo over a cheaper stave silo. *Id.* at 761–62.

Prior to 1974, Marvin Klehr was an experienced farmer. He concedes that he knew before 1974 that exposure of feed to oxygen causes mold and spoilage and that feeding animals spoiled and moldy feed could harm the animals. *Id.* at 114–19, 124.

#### II. Plaintiffs' Experience With the Harvestore Silo

##### A. *Feed Quality and Appearance*

Defendants represented that because of the oxygen-limiting breather bag, no oxygen would contact the feed, yielding higher quality feed than conventional silos. Based on these representations, Plaintiffs did not expect to observe mold in feed stored in the Harvestore silo. *Id.* at 150–67, 611–12. Beginning in 1976, however, Klehr observed in the feed a few white chunks of mold, about the size of a spoon. Concerned about the mold, Klehr inquired of Deutsch as to the cause. Deutsch explained that the mold came from the top layer on the silo and was "normal." According to Deutsch, at the time of filling oxygen entered the silo long enough

---

1. In 1955, Marvin Klehr's father purchased a second Harvestore silo which has been in use on the Klehr farm from 1955 to the present. This silo is not part of the lawsuit.

to cause "a little damage." Deutsch Dep. at 293–95. Deutsch told Klehr to expect a light layer of mold between each filling. Klehr accepted Deutsch's explanation.

Klehr observed light layers of mold between layers and in the spring each of the following years thereafter. Klehr also noticed within weeks of each filling that the feed turned a brown color and smelled like molasses. Klehr did not consider the change in color or odor significant, however, based upon Harvestore's advertising brochures. Advertisements for the silo described Harvestore haylage as "mildly-fermented, molasses-like feed." Ex. 1 to M.K. Aff. According to Harvestore, the fermented smell enticed the cows to eat a lot of the feed. Klehr, therefore, believed that the brown, molasses-smelling feed coming from the silo was normal.

In the spring of 1977, at the end of the feed from the 1976 harvest, Klehr again saw mold, ranging from the size of a quarter to the size of a half dollar, and noticed that the feed had turned much darker brown in color and smelled musty. M.K. Dep. at 297–99. Klehr loaded the spoiled feed into his manure spreader and dumped it in the field. Subsequently, each time Klehr emptied the silo he hauled about two spreader loads of spoiled feed out to the field. He considered one or two spreader loads insignificant. Klehr continued this practice of dumping about two spreader loads of spoiled, moldy feed in the field every spring thereafter. Id. at 349.

One spring, between 1979 and 1982, Klehr observed that the spoilage occurred earlier than usual; the feed became much darker brown and contained significantly more and larger chunks of mold. Id. at 311–12. Klehr immediately shut down the silo and stopped feeding that feed to the cows. He hauled approximately twelve spreader loads out to the field, as opposed to the usual two loads. Id. at 313. That year, Klehr spoke to Deutsch about the heavy spoilage. Deutsch and other MVBA representatives checked Klehr's silo and fixed a broken breather bag. They then pressure tested the silo and reported to Klehr that it was repaired. Id. at 319–20. Subsequently, the feed returned to "normal," requiring Klehr to dump one or two spreader loads when cleaning the silo in the spring.

## B. Herd Health

In the years following his purchase of the Harvestore, Klehr experienced numerous ailments with his herd. Around 1980, Klehr noticed that his herd began to have diarrhea and digestive problems, although it occasionally had suffered diarrhea, or "winter dysentery," in the past. M.K. Dep. at 413. Beginning after 1975 the herd had problems with displaced abomasums, or "twisted stomachs." Klehr had not experienced this problem prior to 1975. He consulted his veterinarian, Dr. Klimmek, who advised Klehr that the feed was too finely chopped. Id. at 420–22. Dr. Klimmek did not indicate that the problem with the consistency of the feed was caused by the feed storage unit. Id.

In approximately 1983, Klehr noticed his cows "going off feed." The feed representative adjusted the rations to resolve this problem. The representative did not associate this problem with the silo; rather, Klehr believed he was feeding his cows too much. Id. at 416–19.

Klehr observed an increase in uterine infections beginning around 1980. Klehr recently had doubled the size of his herd from forty-five to ninety; even with the larger herd, however, the percentage of uterine infections significantly increased. Id. at 427. Klehr spoke to his feed salesmen about the problem several times. They concluded that the cows lacked "some type of vitamin." Id. The feed salesmen added Selenium in addition to vitamins A, D, and E to the diet. Id. at 429.

Also in 1980, the herd began to experience foot problems. Klehr's feed salesman added minerals to the rations to treat the problem. In about 1977 Klehr observed swelling and bruises around the joints on the cows' hind legs. He had never seen this condition prior to 1977. Klehr's veterinarians operated on some of the cows, but were unable to diagnose the cause. His veterinarians did not connect the leg problems to the Harvestore silos.

After 1975 Klehr also noticed that his cows were thin and unthrifty, their coats were rough and their eyes were dull. *Id.* at 440–41. Klehr's feed salesmen told him "they knew that these cows were still lacking something." *Id.* at 445–56. They advised Klehr to alter his ration so that the cows would get "a little bit more grain, or a little bit more feed." *Id.* at 444. Again, no one related the unthriftiness or the dull appearance to the Harvestore silo.

## C. *Breeding and Reproduction*

In the years after 1975, Klehr experienced significant breeding and reproduction problems with his herd. Although the problems occurred over a period of time and did not "hit him overnight," they increased subsequent to the purchase of the Harvestore. Klehr observed, for example, a problem with premature abortions. When asked when this problem began, Klehr stated, "It's been a long time. I guess looking back, maybe at the start of the Harvestore system, yes." M.K. Dep. at 479. Klehr recalls his herd's conception rate during the years he used the Harvestore as "very poor," and he was "very dissatisfied with it." *Id.* at 535. The Dairy Herd Improvement Association ("DHIA") records, which Klehr received monthly during this time period, confirmed the poor conception rate. Klehr believed this problem had existed for ten years prior to filing his state court lawsuit in 1991. *Id.* at 535–36.

After purchasing the Harvestore, Klehr also observed long calving intervals compared to reported averages for Minnesota farmers. *Id.* at 464–65. Klehr investigated the reproduction problems with his veterinarians and feed salesmen, who increased vitamin E and Selenium in the rations. The veterinarians pregnancy tested the cows and told Klehr that some cows had cysts; none, however, indicated that the problems related to the silo.

## D. *Milk Production*

Klehr testified that during the period he used the Harvestore silo, he believed he received the expected increase in milk production. M.K. Dep. at 384–89. Whenever Klehr noticed a decrease in milk production, he attributed the problem to factors other than the Harvestore silo. For example, Klehr believed that his increase in his herd from forty-five to ninety cows depressed the milk production. He also voluntarily reduced his production for eighteen months in accordance with a dairy diversion program. Finally, Klehr attributed any depression of milk production to his herd's health problems, such as the foot problems and uterine infections.

In contrast to his belief that he received the expected increase in milk production from Harvestore, Klehr determined, after reviewing the DHIA records, that his production "was not going anywhere over the years." *Id.* at 512. These DHIA records were available to Klehr monthly during the entire period he used the Harvestore silos. *Id.* at 513. Klehr did not complain about his milk production to anyone until 1990, when he told Deutsch that he should be producing more milk. *Id.* at 378–79.

## E. *Protein Savings*

Contrary to Harvestore's representations that the silo would eliminate the need for protein supplements, Klehr at all times had to add protein to the rations. *Id.* at 699–701. Klehr inquired of Deutsch regarding his failure to realize protein savings. Deutsch explained that due to increased production in recent years, the cows required more protein. *Id.* at 713. Klehr testified that he believed the need to supplement the feed with protein was due to various reasons, such as the way he was "putting up" his haylage or that his fields were not clean enough. *Id.* at 700–701.

## F. *Profitability*

During the period he used the Harvestore silo, Klehr believed he was receiving the promised profits. M.K. Dep. at 644. After filing the state court lawsuit, however, Klehr reviewed his DHIA records and determined that the representations of increased profitability were false. *Id.* at 511–12. Klehr received DHIA records outlining his profits the entire time he used the silo. Mary Klehr testified that Plaintiffs experienced extreme financial hardship from the early 1980's to

1991 or 1992 due to low milk production. Mary Klehr Dep. at 23, 104–106.

When asked about profits incurred or lost in specific years, Klehr testified:

> At the end of the year, I had an enterprise of hogs, milk, crops, and who knows whatever else. It was all thrown into one kitty, and I never once thought it was because of my Harvestore not giving me the profit or not doing what it was supposed to. Could have been the bad hogs, or bad weather, bad crops.... I farmed long enough that you cannot project ahead a whole year what you think you are going to get, because it never comes out that way. You take what the good Lord gives you.

*Id.* at 688–89.

### III. Discovery of the Alleged Defect

Plaintiffs allege that Defendants continued to misrepresent to them the characteristics of the Harvestore silos after the purchase. They claim to have received fraudulent representations in the mail from 1969–91, specifically twenty pieces of advertising before the purchase and thirty-eight pieces of advertising after the purchase. Amended Complaint ¶¶ 10, 15, 16.

Plaintiffs contend that A.O. Smith Corporation knew of the alleged design flaws in the Harvestore silo since the 1960's, but deliberately concealed the defects from consumers. Plaintiffs claim that Defendants' conduct in concealing the deficiencies in the silos while continuing to misrepresent their qualities, prevented them from discovering the defect in the Harvestore silo as the source of the problems with their herd.

In 1991, however, Klehr saw an article in a Minneapolis newspaper regarding a verdict against AOSHPI in Olmsted County, Minnesota. Shortly thereafter, Klehr contacted the University of Minnesota about a mastitis problem with his herd. The University referred Klehr to Dr. William Olson, a veterinarian and Ph.D. In April 1991, Olson visited the Klehr farm and looked inside the Harvestore silo. This was the first time Klehr had looked in the silo prior to unloading. They observed large amounts of mold. Klehr claims that at that point, in April 1991, he realized for the first time that he had been feeding his herd moldy feed for fifteen years and that the spoiled feed had caused his herd significant health problems. *See* M.K. Aff. ¶ 10; Olson Aff. ¶ 2A–B, 7.

Plaintiffs commenced this action on August 27, 1993, alleging: common law fraud (Counts I and II); violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts III and IV); common law negligent misrepresentation (Count V); and violations of Minnesota Statute sections 325F.67, 325F.68–70, 325D.13, 325D.44 (Counts VI–IX).[2]

### DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

■ Under Federal Rule of Civil Procedure 56, a moving party is entitled to summary judgment if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of establishing the non-existence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552–53; *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.,* 838 F.2d 268, 273 (8th Cir.1988). Once it meets that burden, the non-moving party may not then "rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If, based upon the evidence, a reasonable jury could not return a verdict for the non-moving party, summary judgment is appropriate. *Id.* at 248, 106 S.Ct. at 2510.

---

2. Plaintiffs previously filed an action in state court alleging all but the federal RICO claims. On August 18, 1993, Plaintiffs voluntarily dismissed the state court action pursuant to Minnesota Rule of Civil Procedure 41.01. Plaintiffs then filed suit in federal court against AOSHPI, but dropped the claims against MVBA Harvestore, a Minnesota-based independent dealer.

## II. FRAUD CLAIM

### A. Discovery of Fraud

 Under Minnesota law, a party must commence a cause of action for fraud within six years from the date of "discovery by the aggrieved party of the facts constituting the fraud." Minn.Stat. § 541.05 subd. 1(6). The date of discovery is subject to a standard of reasonableness. *Bustad v. Bustad,* 263 Minn. 238, 116 N.W.2d 552, 555 (1962); *Blegen v. Monarch Life Ins. Co.,* 365 N.W.2d 356, 357 (Minn.Ct.App.1985). Thus, " 'the facts constituting the fraud are deemed to have been discovered when, with reasonable diligence they could and ought to have been discovered.' " *Blegen,* 365 N.W.2d at 357 (citations omitted).

A party's failure actually to discover the fraud will not toll the statute of limitations if such failure of discovery is "inconsistent with reasonable diligence." *Id.* The plaintiff carries the burden of proving that he did not, and could not through the exercise of reasonable diligence, discover the fraud within six years before commencement of the action. *Blegen,* 365 N.W.2d at 357.

 The Court recognizes that "normally in a statute of limitations context fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment." *Hines v. A.O. Smith Harvestore Prods., Inc.,* 880 F.2d 995, 999 (8th Cir.1989). Where "the evidence leaves no room for a reasonable difference of opinion," however, the district court properly may resolve fact issues as a matter of law. *Miles v. A.O. Smith Harvestore Prods., Inc.,* 992 F.2d 813, 817 (8th Cir.1993).

 The Klehrs commenced this action on August 27, 1993. If, therefore, the statute of limitations for fraud began to run prior to August 27, 1987, Counts I and II will be time-barred. Defendants contend that the Klehrs knew or should have known shortly after they began using the Harvestore that the silo did not perform as represented and that they were not receiving the promised benefits.

The Klehrs maintain that they did not discover the facts constituting the fraud until April 1991, when Dr. Olson visited the farm and Klehr for the first time saw the moldy feed inside the silo. They assert that they exercised reasonable diligence in attempting to determine the cause of the problems they experienced with their herd over the years.

The evidence shows that the Klehrs should have known shortly after using the Harvestore silo that they were not receiving the represented benefits which induced them to purchase the silo. Mr. Klehr, an experienced farmer, knew that exposure to oxygen causes mold and spoilage harmful to animals. Despite Harvestore's representation that the breather bag would prevent oxygen from contacting the feed and thus eliminate spoilage, Klehr almost immediately observed chunks of mold in his feed. The mold persisted each year Klehr operated the Harvestore. Each year he dumped spoiled feed in the field. The year Klehr noticed a significant increase in mold, along with a darker color and more pungent smell, he recognized the potential harm to his herd and dumped twelve spreader loads of spoiled feed in his field. M.K. Dep. at 311–12.

The entire time he observed chunks of mold in his feed, Klehr's herd experienced numerous health problems. Contrary to Defendant's representations that feed from the Harvestore would result in healthier cows, Klehr saw an increase in digestive problems, uterus infections, foot and leg problems and displaced abomasums. Klehr's cows had dull coats and eyes and were thin and unthrifty. Additionally, the conception rates during his use of the silo were very poor and he experienced increased miscarriages and long calving intervals.

Although certain health problems had occurred prior to 1975, Klehr concedes that many problems increased after the purchase of the silo and that others began for the first time after 1975. While the deterioration in herd health and decrease in reproduction rates did not "hit [Klehr] overnight," these problems, directly contrary to Harvestore's representations, should have been apparent to Klehr at the latest by the early 1980s.

Additionally, Klehr concedes that he never realized any protein savings by using the Harvestore. In stark contrast to the adver-

tisements, Klehr had to supplement the feed with protein at all times. Despite added protein and other vitamins, his cows remained unthrifty and "were still lacking something."

Klehr contends that he reasonably investigated with his veterinarians, feed salesmen and nutritionists each and every problem he experienced with his herd. He maintains that because his experts failed to attribute the problems to the silo, he should not be charged with knowledge that the Harvestore was the source.

■ Although Klehr's experts failed explicitly to link the Harvestore to the problems with his herd, nothing prevented Klehr from discovering the connection. Klehr knew that oxygen caused mold and that spoiled feed could harm cows. In light of the numerous health and reproduction problems he experienced over the years, Klehr should have included the silo among the potential sources of his problems. Despite contrary explanations, Klehr should have made the connection and taken further steps to investigate the silo as the potential cause. As stated in *Veldhuizen v. A.O. Smith Corp.*, 839 F.Supp. 669, 676 (D.Minn.1993), "[t]he limitations period does not wait to run until the [plaintiffs] were able to make a causal connection between the failure of the silo to perform as promised and a particular design defect." Rather, the Klehrs had an affirmative duty to investigate the silo as a cause; the failure to do so is inconsistent with their duty of reasonable diligence. *See Blegen,* 365 N.W.2d at 357. *See also Johnston v. Agristor Credit Corp.,* Civ. No. 84–4421–S (D.Kan.1987) ("It appears from the record that the Johnstons did everything but check their new equipment; such action is not enough to satisfy the requirement that the fraud not be discoverable until December 1982").

Although the Klehrs did not actually discover the causal connection between the silo and the problems with their herd until April 1991, they should have realized well before 1987 that the representations regarding the characteristics of the Harvestore silos were false.

Furthermore, Klehr should have known that he was not realizing the promised increase in milk production and profits which induced him to purchase the silo. He had at his fingertips his monthly DHIA reports indicating that his milk production "was not going anywhere over the years." M.K. Dep. at 512. Similarly, by simply reviewing the DHIA records, Klehr could have learned that he was not receiving the increased profits from his dairy business. Klehr's failure to separate his profits from his various enterprises, rather than combining the proceeds from his entire farm operation "into one kitty," is inconsistent with reasonable diligence as a matter of law.

The Court holds that Plaintiffs should have discovered, through the exercise of reasonable diligence, any fraud committed by Defendants long before 1987.

### B. Fraudulent Concealment

■ Plaintiffs also argue that the statute of limitations should be tolled because Defendants fraudulently concealed the cause of action. "Fraudulent concealment tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." *Hydra–Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 918 (Minn.1990). The limitations period is tolled, however, "only if it is the very existence of the facts which establish the cause of action which are fraudulently concealed." *Id.* at 918–19. Further, "there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." *Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775, 795 (1975). Showing that a defendant fraudulently concealed an alleged defect is insufficient; a plaintiff must show that he actually was unaware of the existence of the defect before the statute of limitations will be tolled. *Hydra–Mac,* 450 N.W.2d at 919.

■ The Klehrs contend that Defendants knew the Harvestore silos were defective and deliberately concealed the defects from them. They assert that Defendants, through fraudulent advertising, misrepresented the characteristics of the Harvestore before and after the sale. These continuing misrepresenta-

tions, the Klehrs claim, concealed the defect and prevented discovery of the fraud; therefore, the statute of limitations should be tolled under the doctrine of fraudulent concealment.

The Court finds that the fraudulent concealment doctrine does not apply to toll the statute of limitations. Defendants here took no affirmative steps which prevented discovery of the very facts establishing the cause of action. "[P]roviding the [Klehrs] with the post-sale materials does not rise to the level of affirmative concealment necessary to toll the statute of limitations." *Veldhuizen*, 839 F.Supp. at 675.

Moreover, the post-sale advertisements could not have concealed from the Klehrs the facts constituting the alleged fraud, namely that the Harvestore did not perform as represented. The Klehrs had only to look at the feed coming from the silo and observe the health of their herd to know that they were not getting better quality feed, protein savings and healthier cows. Further, they had only to look at the monthly DHIA reports to recognize that the promised increase in milk production and profits had not materialized. As the court stated in *Miles v. A.O. Smith Harvestore Products, Inc.,*

> In the present case, Harvestore took no steps to conceal the facts giving rise to appellant's cause of action. It would have been impossible for Harvestore to have done so—the evidence was in appellant's yard, in daily use for the feeding of her animals. Appellant by the exercise of reasonable diligence should have realized that Harvestore had misrepresented the qualities of the silos.

*Miles*, 992 F.2d at 816.

■ Additionally, any management suggestions by Harvestore representatives did not, as a matter of law, rise to the level of fraudulent concealment. The representatives neither criticized Klehr's management of the silo nor attributed the mold, health problems or low milk production to Klehr's mismanagement. M.K. Dep. at 325–28, 332–35, 710–12. Defendants did not affirmatively act with a design to prevent, and did not prevent, Plaintiffs' discovery of the facts establishing their cause of action. Accordingly, the statute of limitations will not be tolled for fraudulent concealment.

## III. RICO CLAIMS

■ Plaintiffs also allege RICO violations under 18 U.S.C. §§ 1962(a)[3] and (c).[4] A four year statute of limitations applies to civil RICO claims. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156–57, 107 S.Ct. 2759, 2767–68, 97 L.Ed.2d 121 (1987). Plaintiffs' RICO claims are thus barred if the statute of limitations began to run prior to August 27, 1989. A civil RICO claim accrues from the time that the plaintiff "discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern."[5] *Granite Falls Bank v. Henrikson*, 924 F.2d 150, 154 (8th Cir.1991) (quoting *Bivens Gardens Office Bldg., Inc. v. Barnett Bank*, 906 F.2d 1546, 1554–55 (11th Cir.1990), *cert. denied* 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991)). As with the statute of limitations for fraud, the date when the injury and the pattern should have been discovered is subject to a standard of reasonableness. *Id.; Veldhuizen v. A.O. Smith Corp.*, 839 F.Supp. 669 (D.Minn.1993).

As evidence of a pattern of racketeering, Plaintiffs allege receiving from Defendants

---

**3.** Section 1962(a) provides in relevant part,

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate or foreign commerce.

**4.** Section 1962(c) provides,

It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

**5.** Plaintiffs cite no authority for their contention that the discovery accrual rule applies to Section 1962(c) but not to 1962(a). Because under both sections the injury results from the defendant's pattern of racketeering activity, the discovery accrual rule will apply to both RICO claims.

twenty pieces of fraudulent advertising through the mail prior to their purchase of the Harvestore, and thirty-eight pieces of fraudulent advertising subsequent to the purchase. Plaintiffs allege a pattern of fraudulent representations by Defendants continuing for a period of more than twenty years.

■ The Court finds that Plaintiffs should have discovered the existence and source of the alleged injury and that the injury was part of a pattern at the same time they should have discovered the fraud. The same facts which should have alerted them to the fraud also should have alerted them that the alleged misrepresentations and injuries were part of a pattern. *See Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 242 (6th Cir.1992) ("as a matter of law [the plaintiff] should have determined that the representations were part of a pattern at the same time it should have discovered that the silos caused the alleged problems on the dairy farm").

■ Plaintiffs contend that even under the discovery accrual rule set forth in *Bivens Gardens* and *Granite Falls*, a new cause of action accrues each time a party suffers an injury caused by a violation of 18 U.S.C. § 1962. Because they suffered damages until 1991, Plaintiffs maintain, a new RICO claim accrued with their last injury, rendering their 1993 lawsuit timely.

The Court rejects Plaintiffs' "last injury" argument. Although separate limitations periods may accrue from new injuries, the separate accrual is limited to distinct and independent injuries. *Glessner v. Kenny*, 952 F.2d 702, 707 (3rd Cir.1991); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2nd Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). In *Glessner*, the plaintiffs brought their RICO actions in 1988 after the defendants had ceased production of an allegedly defective furnace in 1983, thus ending the pattern of racketeering. The plaintiffs argued that al-

though they first suffered injury, in the form of excessive repairs, prior to the expiration of the four year statute of limitations, they suffered a new and independent injury in 1984 when they had to replace the furnace. This new injury, they claimed, reset the statute of limitations. *Glessner*, 952 F.2d at 706–07. The court found that the plaintiffs' replacement of the furnace did not constitute a new and distinct injury but rather a continuation of their initial injury. As the court stated, "the mere continuation of damages into a later period will not serve to extend the statute of limitations." *Id.* at 708.

Similarly, the injury allegedly suffered by the Klehrs through 1991 does not qualify as an independent and distinct injury, but rather a continuation of the damages they suffered since using the Harvestore silo in 1975. Their injury arises out of Defendants' initial alleged wrongdoing, namely the fraudulent misrepresentations.

Because the Klehrs should have discovered the existence and source of this injury and that it was part of a pattern at the same time as they should have discovered the fraud, long before August 1989, their RICO claims are time-barred.[6]

## IV. STATUTORY CLAIMS

■ Counts VI through IX of Plaintiffs' Amended Complaint assert claims for violations of the Minnesota False Statement in Advertisement statute (Minn.Stat. § 325F.67), the Minnesota Consumer Fraud Act (Minn.Stat. §§ 325F.68–70), the Unlawful Trade Practices Act (Minn.Stat. § 325D.13), and the Uniform Deceptive Trade Practices Act (Minn.Stat. § 325D.44). Minnesota Statute section 541.05 subd. 1(2) imposes a six year statute of limitations for claims based on liability created by statute. This provision does not include a discovery allowance as does the statute of limitations applicable to fraud claims. Minn.Stat. § 541.05 subd. 1(2); *Veldhuizen*, 839 F.Supp. at 677. Thus,

---

6. For the same reasons as set forth with respect to the common law fraud claims, the doctrine of fraudulent concealment does not apply to toll the statute of limitations under RICO. Even under the federal fraudulent concealment doctrine, the limitations period will not be tolled unless the

fraudulent concealment "misleads a plaintiff into thinking that he does not have a cause of action." *Davis v. Grusemeyer*, 996 F.2d 617, 624 (3rd Cir.1993). As discussed *supra*, Defendants did not conceal the facts constituting the cause of action.

the six year limitations period commenced on the date of sale, 1974, when each of the alleged statutory violations occurred. *Id.* Accordingly, Plaintiffs' statutory claims are time-barred.

## V. NEGLIGENCE CLAIM

■ Plaintiffs allege in Count V a claim for negligent misrepresentation. Under Minnesota law, a six year limitations period applies to negligence claims. Minn.Stat. § 541.05 subd. 1(5). The statute of limitations begins to run on negligence claims "when the negligent act or omission causes injury on which the injured party could maintain an action." *Wittmer v. Ruegemer,* 419 N.W.2d 493, 496 (Minn.1988). Because Plaintiffs' alleged injuries began immediately after using the silo in 1975, the six year statute of limitations bars their negligence claim.

■ Even if not barred by the statute of limitations, Plaintiffs may not recover for negligence under the economic loss doctrine. *See Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159, 162 (Minn.1981) ("economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability"). As a matter of law, the damages claimed by the Klehrs are non-recoverable economic loss. *Veldhuizen,* 839 F.Supp. at 677. Under either theory, therefore, Plaintiffs' claim for negligence alleged in Count V will be dismissed.

### CONCLUSION

Based on the foregoing and all the files, records and proceedings herein, the defendants' Motion for Summary Judgment (Doc. No. 120) is **GRANTED** and Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**