Donald BULLER, et al., Respondents,

v.

A.O. SMITH HARVESTORE PRODUCTS, INC. petitioner, Appellant,

and

Hawke & Company Harvestore, Inc., Respondent.

No. C5–93–138.

Supreme Court of Minnesota.

June 24, 1994.

Rehearing Denied Aug. 11, 1994.

Frederick W. Morris, John W. Getsinger, Leonard, Street & Deinard, Minneapolis, for appellant.

Ronald H. Schneider, Willmar, for Donald Buller, et al.

David R. Von Holtum, Von Holtum, Malters & Shepherd, Worthington, for Hawke & Company Harvestore, Inc.

## OPINION

KEITH, Chief Justice.

This appeal arises out of the consolidated trial of two complaints by respondents the Bullers, alleging fraud in the sale of three silos manufactured by appellant A.O. Smith Harvestore Products, Inc. (AOSHPI). This court must decide whether certain of the trial court's findings of fact were clearly erroneous.

Donald Buller is an experienced farmer. He and his wife, Eileen, had operated a farm in Lincoln County since 1967 and raised each year approximately 100 head of cattle. He was approached in 1975 by Floyd Oldewurtel, a salesman for a local distributor, Hawke and Company Harvestore, Inc. (Hawke) and encouraged to buy a Harvestore silo for his farm. This salesman represented to Buller that a Harvestore silo acted "like a fruit jar" and was oxygen-limiting. Buller knew that feed spoiled when exposed to oxygen. Buller was told that if he purchased a Harvestore silo, he would expect to see only two to four percent spoilage of feed in the silo, compared to 30 to 35 percent spoilage in a standard concrete stave silo. The salesman projected that Buller would realize a net profit of $36,445 by purchasing one 25 by 90 foot Harvestore silo. The distributor gave Buller brochures, magazines, a film and a "plan for profit." Buller agreed to purchase for approximately $50,000, a Harvestore silo in 1975. At that time, the price of a stave silo would have been approximately $16,500, and a bunker silo would have cost approximately $3,000 to $5,000.

Buller first filled the Harvestore with corn silage in the fall of 1975. Within approximately six to eight weeks of filling the silo, he began to notice white mold on the silage. Buller recognized the mold because he had seen similar molds on feed coming from his concrete stave silo. Buller showed the spoiled feed to Oldewurtel, who told him that "it was just yeast." In June of 1976, Buller refilled the silo with haylage, following

Harvestore's instructions regarding moisture content and chopping. After approximately six to eight weeks, he noticed white and gray mold on the feed. Buller again notified Olde-wurtel, who told him that he was leaving the feed or fill doors open too long. Buller filled the silo several times prior to 1978 and each time observed spoilage of the feed within approximately six to eight weeks of filling.

Buller mentioned the spoiled feed to Olde-wurtel and the latter's successor, Jerry Tieg-land, an indeterminate number of times; they told him that he was "doing something wrong" and to "watch [his] management." Buller "tried very hard to always get everything up right." Buller observed, however, that more than two to four percent of his feed was spoiling in the Harvestore. Buller testified that it "bothered" him to tell Olde-wurtel or Tiegland about the spoiled feed because he "didn't want to hurt his feelings." Despite his experience with the silo he'd purchased in 1975, Buller contracted to lease two more Harvestores in 1978.[1] Buller observed spoilage of the feed stored in the 1978 silos. Between 1978 and 1982, approximately 50 percent of corn and 40 percent of haylage and silage stored in the Harvestores were damaged.

The trial court found that AOSHPI, through its dealers, represented to consumers that the Harvestore silo would substantially reduce feed spoilage by limiting the amount of oxygen which could reach the feed. AOSHPI claimed that "breather bags" in Harvestore silos equalized the pressure between the inside of the silo and the outside air, thereby preventing outside air from coming in contact with the feed. By 1975, however, AOSHPI knew that these claims were false.

From 1953 to 1975 AOSHPI knew that a breather bag capacity of less than 10 percent of the total volume of a silo could not adequately prevent oxygen from entering the structure. The 1975 Harvestore silo sold to Buller had a breather bag capacity of 3.29 percent. AOSHPI also knew that oxygen entered Harvestore silos during unloading. In 1969, AOSHPI executives knew that "an unloader operating without an air intake control attachment admits a great deal of air into the trough and bridge space increasing the oxygen content in these areas to nearly 21 percent [the normal percentage of oxygen in the atmosphere]." Though AOSHPI did not perform studies to determine the amount of air entering the silos during unloading, they continued to advertise the silos as "preventing harmful oxygen from reaching the feed." AOSHPI also knew that oxygen entered Harvestore silos through a "pressure relief valve." Neither AOSHPI nor its agent, Hawke, informed Buller that Harvestore silos had pressure relief valves through which outside air could enter the silo.

The trial court found that AOSHPI, through Hawke, made the above representations with the intent of inducing Buller to act in reliance upon them. Buller reasonably relied upon these representations and was damaged as a result. These findings are not challenged in this appeal.

The Bullers filed their first complaint in 1983.[2] This complaint alleged counts against AOSHPI and Hawke with respect to silos purchased by the Bullers in 1975 and 1978. The Bullers filed their second complaint in 1984. That complaint alleged counts against

---

1. The lease provided for 12 annual payments with a buy-out option.

2. Count III of the 1983 complaint alleged the following:
    That Defendant, Smith, had for many years prior to the year 1978, been engaged in the design, manufacture, sale, promotion and advertising of storage facilities as purchased by Plaintiff and Defendant, Hawke, for many years prior to the year 1978, had been engaged in the sale, promotion, advertising and installation of storage facilities as purchased by Plaintiff and both Defendants promoted and advertised to the agriculture (sic) community in gen-

eral that they were familiar with the problems of grain and haylage storage. That the Defendants, Smith and Hawke expressly and impliedly warranted to Plaintiff that the design, manufacutre (sic) and installation of the facilities purchased by Plaintiff from the Defendants and to be installed at Plaintiff's farm premises in Lincoln County, Minnesota, would be in a fit and proper manner for the carrying on of Plaintiff's grain and hay storage operation. That Defendants expressly impliedly (sic) warranted that said structures would be substantially free of leakage such as did in fact occur on Plaintiff's structures.

AOSHPI and A.O. Smith Corporation solely with respect to the silo purchased in 1975.

On October 14, 1986, District Judge George Marshall consolidated the two actions and dismissed several counts of the two complaints. Judge Marshall dismissed all counts of the 1984 complaint as alleged against A.O. Smith Corporation because A.O. Smith Corporation was AOSHPI's parent company and the Bullers had submitted no evidence to support a "piercing of the corporate veil." Judge Marshall also dismissed count I of the 1983 complaint and count III of the 1984 complaint (warranty claims) because they were barred by the four-year statute of limitations. Finally, Judge Marshall held that count II of the 1983 complaint and counts I and IV of the 1984 complaints (negligence and products liability claims) were barred by this court's holding in *Superwood v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981) (modified in a manner unimportant to this appeal by *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn.1990)). Judge Marshall did not dismiss count III of the 1983 complaint, stating "Count III of April 1983 is based on fraud and is not dismissed." Finally, Judge Marshall did not dismiss counts II and V of the 1984 complaint (fraud and punitive damages based on fraud) because they were based on fraud.[3]

By the time of trial in May, 1992, therefore, each complaint had two remaining claims: counts III and IV of the 1983 complaint (breach of warranty/"fraud" and punitive damages claims) and counts II and V of the 1984 complaint (fraud and punitive damages). The 1983 complaint pertained to all three silos, but the 1984 complaint was only with respect to the 1975 silo.

At a pre-trial conference, May 18, 1992, before Judge Jeffrey L. Flynn, counsel for the Bullers moved to amend their pleadings to "allege fraud with a greater particularity." Counsel did not indicate whether this motion pertained to the 1983 or 1984 complaint, nor did he indicate whether the "fraud" was with respect to the 1975 or 1978 silo sales. Each of the "amendments" alleged specific representations made by Hawke or AOSHPI.

Several of the amendments referred to "silos" or "each silo," indicating that the Bullers' counsel intended to allege fraud against all of the silos. None of the allegations pertained to only the 1978 sales, however, and each of the allegations could be understood as pertaining to just the 1975 sale. In response to this motion, AOSHPI's counsel stated:

> the 1983 complaint doesn't have any fraud claim in it and the 1984 complaint involves the 1975 silo.

Buller's counsel did not respond to this statement.

Judge Flynn conducted a bench trial from May 19 to June 10, 1992. Throughout the trial, both sides introduced information regarding AOSHPI's representations before and after 1975 and the performance of all three silos. This evidence was relevant to a fraud claim with respect to the 1978 silos. This evidence was also relevant, however, to whether or when Buller knew or should have known that he had a cause of action for fraud against AOSHPI and Hawke.

On October 22, 1992, the trial court ordered judgment for AOSHPI and Hawke, holding that count III of the 1983 complaint did not allege fraud, that the parties did not consent to try a claim for fraud relative to the 1978 sale, and therefore the Bullers' only fraud claim was with respect to the 1975 sale. The trial court found that the Bullers had proven all the elements of their cause of action for fraud. The trial further held that AOSHPI and Hawke did not fraudulently conceal the Bullers' cause of action for fraud with respect to the 1975 sale and that claim was therefore barred by the six-year statute of limitations. Finally, on March 11, 1993, the trial court awarded costs and disbursements to AOSHPI in the amount of $69,327.45. The trial court did not grant the Bullers' request for a hearing to determine the reasonableness of AOSHPI's alleged costs, but made detailed factual findings based on affidavits and filed a memorandum of law with the order.

---

**3.** Judge Marshall did not address count IV of the 1983 complaint (punitive damages against Hawke) because that count was added by amendment in 1987.

The court of appeals affirmed the 1986 dismissal of the Bullers' negligence and strict liability claims, but reversed the trial court's holding that the parties did not try by implied consent, an action for fraud with respect to the 1978 silo sales. It also reversed the trial court's holding that AOSHPI and Hawke had not fraudulently concealed the Bullers' cause of action for fraud with respect to the 1975 silo and therefore held that the claim was not barred by the statute of limitations. The court of appeals remanded the case to the trial court to "calculate damages consistent with those findings and to order judgment in favor of appellants." It did not review the trial court's award of costs and disbursements.

The main issues in this case are whether this court should overturn the trial court's findings of fact (1) that the appellants did not impliedly consent to try a cause of action for fraud with respect to the 1978 silo purchases and (2) that the appellants did not fraudulently conceal a cause of action for fraud with respect to the 1975 silo purchase.

A trial court's findings of fact will not be overturned unless clearly erroneous. Minn. R.Civ.P. 52.01 (1994). Where a trial court's findings are reasonably sustained by the evidence as a whole, they will not be disturbed by this court. *In re Estate of Sandstrom,* 252 Minn. 46, 61, 89 N.W.2d 19, 28 (1958). This court will accept the evidence most favorable to the trial court's findings. *State v. Fischer,* 245 Minn. 1, 8, 71 N.W.2d 161, 166 (1955).

### I.

Minn.R.Civ.P. 15.02 (1994) states:

**Rule 15.02  AMENDMENTS TO CONFORM TO THE EVIDENCE**

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of a trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues raised by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that admission of such evidence would prejudice maintenance of the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

■ The trial court should have granted the Bullers' post-trial motion to amend their pleadings to include an action for fraud with respect to the 1978 silo purchases [4] if it found that the parties impliedly consented to trial of that issue. The trial court found, however, that the parties did not impliedly consent to try the issue. This finding is reasonably sustained by the evidence as a whole and therefore is not clearly erroneous.

In a pretrial conference, the Bullers' counsel moved to amend their claim to "allege fraud with a greater particularity." In response to this motion, AOSHPI's counsel noted that "the 1983 complaint doesn't have any fraud claim in it and the 1984 complaint involves the 1975 silo." The Bullers' counsel said nothing in response to this statement. The Bullers' amendments only alleged specific representations made by Hawke and AOSHPI and did not indicate whether the representations were relevant to the 1975 or 1978 purchases. Although several of the amendments referred to "silos" or "each silo," indicating that the Bullers' counsel intended to allege fraud with respect to all of the silo sales, none of the allegations pertained to only the 1978 sales, and each of them could be understood as pertaining to just the 1975 sale.

Finally, throughout the trial, both sides introduced information relevant to a claim of

---

4. The trial court held that count III of the Bullers' 1983 complaint did not allege a cause of action for fraud. We agree.

fraud with respect to the 1978 silo sales, but this evidence was equally relevant to the issue of whether the Bullers had discovered their cause of action for fraud with respect to the 1975 silo. This court has held that "consent to try an issue outside the pleadings cannot be implied where the evidence is pertinent to issues actually made by the pleadings." *Roberge v. Cambridge Cooperative Creamery Co.*, 243 Minn. 230, 234, 67 N.W.2d 400, 403 (1954). We hold, therefore, that the trial court's finding on the issue of consent was not clearly erroneous and its failure to grant the respondents' post-trial motion to amend their complaint was not an abuse of discretion.

## II.

■ The record includes considerable evidence tending to support the trial court's finding that, before December 10, 1978, the Bullers should have discovered the existence of a cause of action for fraud against AOSH-PI. Before 1975, Buller knew that exposure to oxygen would cause feed to spoil. Buller observed spoiled feed approximately six to eight weeks after filling his Harvestore silo for the first time. Although Oldewurtel told Buller that the spoilage he observed was only yeast, Buller had observed spoiled feed before and could reasonably be expected to recognize white and gray molds. Buller refilled his first Harvestore several times prior to 1978 and observed spoilage of the feed within six to eight weeks of every filling. When Hawke employees told Buller to improve his management of the Harvestore, Buller did so, but still observed significant spoilage. Finally, Hawke employees had represented to Buller that he could expect to see two to four percent spoilage in a Harvestore silo; yet, by 1978 Buller knew that significantly more feed was spoiling in the silo.

■ Fraudulent concealment "tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn.1990). This is so for two reasons: (1) the plaintiff who does not assert his or her right because of the defendant's fraudulent

concealment is not within the "mischief" sought to be remedied by a statute of limitations, and (2) the defendant who fraudulently conceals a cause of action "should not be permitted to shield himself behind the statute of limitations where his own fraud has placed him." *Schmucking v. Mayo*, 183 Minn. 37, 40, 235 N.W. 633, 634 (1931). A plaintiff must exercise reasonable diligence when he or she has notice of a possible cause of action for fraud. *See Bustad v. Bustad*, 263 Minn. 238, 116 N.W.2d 552 (1962). In *Hydra–Mac*, 450 N.W.2d 913, for example, this court held that defendant Onan had not fraudulently concealed a cause of action from the plaintiff, International Harvester, noting that the plaintiff had information that it may have had a cause of action. *Hydra–Mac* at 919. In that case, International Harvester claimed that Onan had fraudulently concealed design defects in engines sold for installment in "skid loaders" ultimately sold by International Harvester. *Id.* The court noted:

> International Harvester's claim, concurred in by the courts below, is that Onan fraudulently concealed the permanence of the problem by failing to advise Hydra–Mac and/or International Harvester that the engines could never be repaired to the point of remedying the defects inherent in them. We disagree. *International Harvester, as well as Onan, knew that after each "fix" that (sic) the performance problems continued.*

*Id.* (emphasis added). This court so held despite evidence that Onan knew that the engine had inherent design defects which could not be remedied by any of its repairs. *Id.* at 916. Similarly, in this case, Buller knew after each of Hawke's employees' admonitions to "watch his management" of the silo, that the feed spoilage continued. As this court noted in *Hydra–Mac*, "[a] party need not know the details of the evidence establishing a cause of action, only that the cause of action exists." *Id.* at 919.

The Bullers argue that AOSHPI fraudulently concealed their cause of action through its post-sale advertising materials. We do not find this argument persuasive. The Bullers bore the burden of proving that the

concealment could not have been discovered sooner by reasonable diligence on their part and that their failure to discover it was not the result of their own negligence. *See Wild v. Rarig,* 302 Minn. 419, 450–51, 234 N.W.2d 775, 795 (1975), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Buller knew that, despite his efforts to conform to the manual's instructions, the feed was spoiling in the Harvestore within six to eight weeks of filling it. Prior to December 1978, Buller had observed that more than two to four percent of the feed spoiled each of several times he filled the 1975 silo. The trial court reasonably concluded, based on these facts, that the Bullers' failure to discover the facts constituting fraud before December 10, 1978 was the result of their own negligence.

In *Hydra–Mac,* we noted that the plaintiff knew that, after each of the defendant's repairs, the equipment continued to fail to perform adequately. Although in that case the defendant eventually informed the plaintiff that the equipment could not be made free of problems, we noted, "[plaintiff] had information that it may have had a cause of action for defective engines *from the inception of the arrangement with [defendant] until it commenced this lawsuit."* Hydra–Mac, 450 N.W.2d at 919 (emphasis added). Viewing the record as a whole, the trial court's finding that Buller should have known that they had a cause of action for fraud before December 10, 1978 was not clearly erroneous.

### III.

■ The Bullers' also argue that the trial court was required to grant them a hearing to determine the reasonableness of AOSHPI's alleged costs and disbursements and that failure to grant them a hearing was an abuse of discretion. The court of appeals declined to reach this issue because they reversed and remanded to the trial court to order judgment in favor of the Bullers.

Minn.R.Civ.P. 54.04 (1994) states the following:

**RULE 54.04  COSTS**

Costs and disbursements shall be allowed as provided by statute. Costs and disbursements may be taxed by the court administrator on 2 days' notice, and insert-

ed in the judgment. The disbursements shall be stated in detail and verified by affidavit, which shall be filed, and a copy of such statement and affidavit shall be served with the notice. The party objecting to any item shall specify in writing the ground thereof; a party aggrieved by the action of the court administrator may file a notice of appeal with the court administrator who shall forthwith certify the matter to the court. The appeal shall be heard upon 8 days' notice and determined upon the objections so certified.

Minn.R.Civ.P. 54.04 (1994). On its face, this rule does not require the trial court to conduct a hearing to determine the reasonableness of the alleged costs.

The trial court's method of handling the determination of costs and disbursements conformed to the express requirements of Minn.R.Civ.P. 54.04 (1994). AOSHPI submitted a Notice of Taxation of Costs with accompanying affidavits which were later supplemented in response to the Bullers' objections. These affidavits alleged total costs and disbursements of $129,772.31. The Bullers responded to AOSHPI's claimed costs in a memorandum. The trial court made detailed findings of fact regarding each of AOSHPI's claimed costs and awarded total costs and disbursements of $69,327.45. We believe that the trial court's findings were amply supported by the record and the trial court was not required to conduct an evidentiary hearing.

Reversed and the trial court's findings and judgment are reinstated.

COYNE, J., took no part in the consideration or decision of this case.