_____

No. 95-1373
_____

Association of Commonwealth        *
Claimants, an unincorporated       *
association,                       *
                                   *
          Appellant,               *
                                   *
     v.                            *
                                   *
James Moylan; Alfred H. Adams;     *
Douglas G. Alford; Darrell D.      *
Anderson;  Denis K. Appelbee;      *
Roy L. Ashcraft; William C.        *
Beckman; Kenlon L. Hake;           *   Appeal from the United States
Allan C. Roemmich; Timothy R.      *   District Court for the
Spoeneman; Kenneth A. Wellman;     *   District of Nebraska.
Dennis O'Neal; Commerce Savings,*
Columbus, Inc.; Commerce           *
Savings, Lincoln, Inc.;            *
Commerce Savings, Scottsbluff,     *
Inc.; Commerce Group, Inc.;        *
First National Bank, of Grand      *
Island, Inc.; Provident            *
Federal Savings Bank, Inc.;        *
Union National Bank & Trust        *
Company, Inc.; First National      *
Bank, of Omaha, Inc.,              *
                                   *
          Appellees.               *

_____

               Submitted:  October 16, 1995

                  Filed:  December 6, 1995
               _____

Before FAGG, BOWMAN, HANSEN, Circuit Judges.

               _____

BOWMAN, Circuit Judge.

This is one of several cases spawned by the failure of Commonwealth Savings Company (Commonwealth), a state-chartered industrial loan and investment company located in Lincoln, Nebraska. The issue presented in this appeal is whether the District Court[1] erred when it held that appellant's Racketeer Influence and Corrupt Organization (RICO) claim, 18 U.S.C. §§ 1961-1968 (1988), is barred by the statute of limitations. We affirm the judgment of the District Court.

The appellant, Association of Commonwealth Claimants (ACC), is an unincorporated association representing creditors and depositors of the failed industrial thrift. ACC is the assignee of the receiver of Commonwealth. Appellees are the executive director and former members of the board of directors of the Nebraska Depository Institution Guaranty Corporation (NDIGC), the financial institutions that employed those directors, and the corporate owners of those employers. Two other corporate appellees were not employers of NDIGC directors but are alleged to be co-conspirators of the other appellees.

ACC filed this RICO action against the appellees on December 8, 1988. The gravamen of the complaint is that the appellees used the NDIGC as a RICO "enterprise" to engage in fraudulent activity that ultimately led to the collapse of Commonwealth and bilked depositors out of several million dollars. In January 1989, the appellees moved to dismiss the complaint as time-barred under Federal Rule of Civil Procedure 12(b)(6), but ACC filed a motion to stay the action while related litigation between the parties was pending before this Court. The District Court granted ACC's motion to stay the proceedings on March 9, 1989. When the related litigation was resolved, the appellees moved the court to lift the stay order and renewed their motion to dismiss

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

the complaint.  The District Court lifted its stay order and dismissed the complaint as time-barred.  This appeal followed.

## I.

This case has a long and complicated procedural history.  It is necessary to review the preceding twelve years of litigation in this case because the accrual of the statute of limitations requires this Court to determine what the parties knew and when they knew it.

### A.    Proceedings Initiated By The Receiver

Commonwealth was declared insolvent in 1983.  On November 1, 1983, the Nebraska Department of Banking and Finance (Department) took possession of Commonwealth.  On November 8, 1983, the district court for Lancaster County, Nebraska, placed Commonwealth into receivership and appointed the Department receiver for Commonwealth (Receiver).  At the time of its insolvency, Commonwealth was a member institution of the NDIGC--a state-chartered private corporation modeled after the Federal Deposit Insurance Corporation to guarantee deposits and shareholdings of member institutions. See Nebraska Depository Institution and Guaranty Corporation Act, Neb. Rev. Stat. §§ 21-17,127 to 21-17,145 (1991).  The NDIGC originally guaranteed deposits up to $10,000 and subsequently increased that amount to $30,000.  The $30,000 guarantee was in effect at the time Commonwealth was declared insolvent.

On December 23, 1983, the Receiver filed an action with the State Claims Board (Board) against the State of Nebraska under the State Tort Claims Act, Neb. Rev. Stat. §§ 81-8,209 to 81-8,239.06 (1981 & Supp. 1983), on behalf of all creditors to recover $56 million in losses sustained by Commonwealth creditors, alleging negligence of the Department in the regulation and supervision of Commonwealth.  The Receiver alleged that the Department's employees

caused the creditors' losses by conspiring with officers and directors of the NDIGC to deceive the creditors of Commonwealth. The Receiver then filed an amended tort claim with the Board on January 10, 1984, for $56.4 million.[2] The amended claim was similar to the first tort claim, except that it was brought on behalf of a special class of creditors--those certificate of indebtedness holders whose accounts were guaranteed by the NDIGC. The purpose of the amended claim was to recover the $30,000 NDIGC guarantee on behalf of each certificate of indebtedness holder. In the amended claim, the Receiver alleged once again that the Department's employees caused losses by fraudulently conspiring with officers and directors of the NDIGC. Consequently, even though the two tort claims were directed primarily at the acts and omissions of the employees of the Department, many of the Receiver's allegations focused on an alleged conspiracy between employees of the Department and NDIGC officers and directors--the same NDIGC individuals who are named as defendants in this RICO action. While these state tort actions were proceeding, the NDIGC itself collapsed due to severe under-capitalization of the NDIGC fund. The NDIGC met its untimely demise on January 4, 1985, without having satisfied its guarantee obligations to Commonwealth depositors.

The Board heard the Receiver's claims on February 13, 1984. In the proposed work-out plan submitted by the Receiver to the Board, the Receiver estimated a shortfall in NDIGC funds of approximately $57 million. At that time, the Receiver estimated NDIGC funds were a mere $1.2 million. On February 29, 1984, the Board found that there was a strong possibility that the State of Nebraska may be liable for the Department's actions with respect to the Nebraska Depository Institution Guaranty Corporation Act. Based on its findings, the Board decided that the state should

---

[2]The Receiver subsequently increased the amount sought to $65.7 million.

compromise and settle the claims.  In accordance with state law, the Receiver submitted the Board's decision to the Lancaster County district court for approval.  After a hearing, the district court rejected the Board's settlement decision for numerous reasons.  See In the Matter of the State Tort Claim of the Department of Banking and Finance of the State of Nebraska, Receiver of Commonwealth Savings Co., Docket 380, Page 10, Order at 30 (Neb. Dist. Ct. March 16, 1984).[3]  In its thirty page opinion, the district court pointed out that the Board had received into evidence two reports prepared by John Miller, the interim director for the Department, and David A. Domina.  These reports, commonly known as the Miller-Domina reports, were highly critical of Paul Amen, the former state banking director.  The reports concluded that Mr. Amen did not exclude weak industrial thrifts like Commonwealth from the NDIGC fund because he feared that such action would expose the fact that the NDIGC had inadequate funds to cover guarantees of the members' accounts, which, in turn, would create a domino-like series of failures throughout the state's other industrial thrifts.

After rejecting the proposed settlement, the district court remanded the matter to the Board, which issued a second decision recommending a compromise settlement once again.  After conducting a hearing, the district court also rejected this second Board decision.  See In the Matter of the State Tort Claim of the Department of Banking and Finance of the State of Nebraska, Receiver of Commonwealth Savings Co., Docket 380, Page 10, Order at 46 (Neb. Dist. Ct. July 27, 1984).  The district court then remanded the matter to the Board yet again to allow the Receiver to withdraw the claim and to file suit on the claim.  The Receiver

---

[3]At the request of both sides, Judge Strom took judicial notice of this case and other closely related cases.  Consequently, we may properly consider them when reviewing this motion to dismiss.  See Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994) (holding public documents filed in earlier state court case were properly considered when deciding motion to dismiss for failure to state claim).

filed suit against the State of Nebraska on March 20, 1985, in Lancaster County district court, alleging numerous acts of wrongful and negligent conduct by the Department in failing to supervise, regulate, and examine Commonwealth, including wrongful and negligent conduct of the Department's director in admitting Commonwealth as a member of the NDIGC. Nine days later, the parties sought approval of an $8.5 million compromise settlement. The state district court subsequently approved this settlement agreement.

## B.    Proceedings Initiated By ACC

ACC was formed in 1985. In 1986, ACC filed its first RICO action in federal court against the former director of the state banking department and others as assignee of the causes of action of more than 2,600 Commonwealth creditors. See Complaint, Weimer v. Amen, No. 86-L-248 (D. Neb. March 24, 1986). An amended complaint was filed in 1987. A short time later, ACC also initiated a state law fraud action in Lancaster County district court with similar factual allegations against the same defendants, but without RICO allegations. The defendants in these cases asserted that ACC lacked standing to bring suit, claiming that the causes of action belonged to the Receiver. While these standing issues were pending before the federal and state courts, ACC obtained an assignment from the Receiver on December 2, 1988, which purported to assign all of the Receiver's remaining causes of action to ACC. ACC then filed this present RICO action on December 8, 1988, based upon the assignment from the Receiver; this action incorporates the identical RICO claim as alleged in the first RICO action, but cures the standing defect by alleging an assignment of the Receiver's causes of action against the appellees. A new state court fraud action also was filed on December 5, 1988, based upon the assignment. Appellees filed joint motions to dismiss the new suits, but, at the request of ACC, these

new actions were stayed pending final decisions in the original suits.

In 1990, the Nebraska Supreme Court held that ACC lacked standing in the original state fraud case. <u>Weimer v. Amen</u>, 455 N.W.2d 145, 153 (Neb. 1990). Following the lead of the Nebraska Supreme Court, the District Court also held that ACC lacked standing in the original RICO action. <u>Weimer v. Amen</u>, No. 86-L-248, slip op. at 7 (D. Neb. Aug. 24, 1990). We subsequently affirmed that ruling on appeal, <u>Weimer v. Amen</u>, No. 87-2331, slip op. at 3 (8th Cir. Jan. 22, 1992), and certiorari was denied, <u>Weimer v. Amen</u>, 113 S. Ct. 74 (1992). ACC then sought leave to file a second amended complaint to incorporate an assignment from the Receiver to cure the standing defect. The District Court denied this motion, and we affirmed on appeal. <u>Weimer v. Amen</u>, No. 93-1410, slip op. at 3 (8th Cir. Dec. 15, 1993).

After the courts entered final orders in the original suits, the stays were lifted in the second set of suits. In 1994, the Nebraska Supreme Court held that the second state fraud action was barred by Nebraska's four-year statute of limitations. <u>ACC v. Moylan</u>, 517 N.W.2d 94, 101 (Neb. 1994). Similarly, the District Court dismissed the second RICO suit (this action) on January 5, 1995, as time-barred under the four-year limitations period applicable to civil RICO actions. <u>ACC v. Moylan</u>, No. 88-690, slip op. at 9 (D. Neb. Jan. 5, 1995). The District Court reasoned that the Receiver, and ACC by assignment, had discovered more than four years before the filing of this suit that the NDIGC was without sufficient funds to make good on its account guarantees. Relying on the state tort claims filed by the Receiver in December 1983 and later in January 1984, the District Court determined that the Receiver, and ACC by assignment, had discovered or reasonably could have discovered all of the elements of the RICO cause of action no later than July 1984. ACC timely appeals.

**II.**

We review de novo the granting of a motion to dismiss under Rule 12(b)(6). <u>Dover Elevator Co. v. Arkansas State University</u>, 64 F.3d 442, 445 (8th Cir. 1995).

The issue before us is whether ACC's second RICO action was filed within the time allotted by the statue of limitations. In making this determination, we are mindful that ACC stands in the shoes of its assignor--the Receiver of Commonwealth. The rights ACC acquired by assignment are no greater than those possessed by the Receiver. <u>See</u> <u>State Securities Co. v. Daringer</u>, 293 N.W.2d 102, 105 (Neb. 1980) (holding assignee acquires only rights of assignor). Accordingly, the facts known to the Receiver that are relevant to accrual must be imputed to ACC. This means that ACC cannot maintain this action if the statute of limitations defense would have been good against the Receiver. The critical inquiry thus becomes what did the Receiver know and when did the Receiver know it.

Civil RICO actions are governed by a four-year statute of limitations. <u>Agency Holding Corp. v. Malley-Duff & Assocs.</u>, 483 U.S. 143, 156 (1987). As noted above, this case was filed on December 8, 1988. To fall within the four-year limitations period, the RICO claim must not have accrued prior to December 8, 1984. With respect to each independent injury to the plaintiff, a civil RICO cause of action accrues "as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." <u>Granite Falls Bank v. Henrikson</u>, 924 F.2d 150, 154 (8th Cir. 1991) (quoting <u>Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.</u>, 906 F.2d 1546, 1555 (11th Cir. 1990), <u>cert. denied</u>, 500 U.S. 910 (1991)).

We conclude that the facts of this case demonstrate that prior to December 8, 1984, the Receiver had knowledge of both the existence and source of its injury and that the injury was part of a pattern. In the first state tort claim filed by the Receiver on December 23, 1983--nearly five years before this suit was filed--the Receiver alleged that state employees conspired with NDIGC officers and directors to defraud Commonwealth creditors. Less than a month later, in the amended state tort claim filed on January 10, 1984, the Receiver alleged once again that state employees conspired with NDIGC officers and directors to defraud Commonwealth depositors. Even though the Receiver failed to make NDIGC directors defendants in those state tort actions, the Receiver believed that the NDIGC directors--who are appellees in this case--were part of a conspiracy.

The documentary evidence submitted as part of these state tort proceedings also shows that the Receiver knew of the NDIGC's anemic financial condition more than four years before this suit was filed. The Receiver attached a work-out plan as part of these state tort proceedings that showed a shortfall in the NDIGC fund of approximately $57 million. After the state district court rejected this plan, a second petition showed that the Board estimated a NDIGC shortfall in the range of $15 million to $45 million. Finally, the Miller-Domina reports showed that the failure of a major industrial thrift like Commonwealth would cause the collapse of the NDIGC.

In light of the facts and circumstances known to the Receiver through the state tort proceedings and the corresponding documentation, it is apparent that the Receiver had knowledge of the existence and source of the injury before December 8, 1984. The Receiver was also aware that the injury was part of pattern prior to December 8, 1984, because the Receiver refers throughout these documents to the "schemes," "conspiracies," and "frauds" conducted by the appellees. We agree with the District Court that

these "statements demonstrate that the Receiver was, at a minimum, aware of a vague pattern sufficient to satisfy the accrual requirements of Granite Falls Bank." ACC v. Moylan, No. 88-690, slip op. at 9 (D. Neb. Jan. 5, 1995). Accordingly, the Receiver, and ACC by assignment, knew of the existence, source, and pattern of injury more than four years before this suit was filed. The action is therefore time-barred.

ACC attempts to bring its stale claim within the statute of limitations by arguing that Commonwealth depositors suffered a new and independent injury when the NDIGC collapsed on January 4, 1985. In other words, ACC argues that the collapse of NDIGC is a second injury for which the statute of limitations begins to run anew because, under Granite Falls, each independent RICO injury accrues separately. ACC complains that the District Court failed to realize that there were two economic injuries. This novel argument is fatally flawed for three reasons.

First, the second injury theory is not alleged anywhere in the complaint; it is an entirely new contention. Second, even if this theory were adequately pleaded and even if the NDIGC's inability to satisfy the guarantees may be considered a distinct and separate injury with respect to the depositors, the Nebraska Supreme Court has already determined that any claim arising from such a second injury accrued on November 8, 1983, when Commonwealth was declared insolvent. ACC v. Moylan, 517 N.W.2d at 101. Third, the allegations made in the complaint (and throughout the course of the twelve years of litigation) run counter to this second injury argument. ACC alleges that Commonwealth creditors and depositors were damaged by predicate acts, all of which occurred prior to November 1, 1983. These same actions are also alleged in the complaint to have had a "pervasive, debilitating, and ultimately fatal impact" on the NDIGC. Complaint at ¶ 20. Even though ACC now claims that it was not injured until January 4, 1985, these same injuries formed the basis of the state tort claims filed by

the Receiver in December 1983 and January 1984. Indeed, the Receiver's January 10, 1984 tort claim specifically addressed the losses of the depositors' $30,000 account guarantees--the same injury that ACC now claims did not even occur until nearly a year later when the NDIGC closed. The insolvency of Commonwealth, and the consequent insolvency of the NDIGC, were at the very heart of the Receiver's allegations in the state tort claims.

Undeterred, ACC asserts that even if the Receiver knew of the NDIGC's insolvency in January 1984, the limitations period did not begin to run until the account guarantees became "uncollectible" on January 4, 1985, when the NDIGC finally shut its doors. ACC claims that until the NDIGC actually closed, there was a possibility that some fractional portion of the depositors' guarantees might be honored. This argument reflects a misunderstanding of the governing law. The <u>Granite Falls</u> test, properly applied, does not postpone accrual of a RICO claim until the injured party's damages can be ascertained with mathematical precision. Instead, the limitations period begins to run even though the injured party, knowing he has suffered an injury, may not yet know the full extent of his injuries. <u>Cf</u>. <u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 240 (9th Cir. 1987) ("[U]ncertain damages, which prevent recovery, are distinguishable from uncertain extent of damage, which does not prevent recovery. . . . The question of whether there is a right to recovery is not to be confused with the difficulty in ascertaining the scope or extent of the injury."). ACC has confused knowledge of the existence of its injury with knowledge of the exact amount of its injury. In regard to injury, all that is required to start the running of the clock on a RICO claim is knowledge of the fact of injury, not knowledge of the precise quantum of damages.

For the foregoing reasons, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.