No. 95-1355

Marvin Klehr and Mary Klehr;          *
                                      *
        Plaintiffs-Appellants,          *
                                      *
William G. Olson,                     *
                                      *
        Intervenor,          *          Appeal from the United States
                                      *          District Court for the
    v.                            *          District of Minnesota.
                                      *
A.O. Smith Corporation;               *
A.O. Smith Harvestore Products,       *
Inc., Jointly and Severally,          *
                                      *
        Defendants-Appellees.          *


_____

MVBA Harvestore Systems,

        Movant.

_____

Submitted:  October 18, 1995

Filed:  June 6, 1996
_____

Before FAGG, HEANEY, and HANSEN, Circuit Judges.
_____


HANSEN, Circuit Judge.


    Marvin Klehr and Mary Klehr (Klehrs) appeal from the district court's[1] entry of summary judgment against them on their various Minnesota state law and Racketeer Influenced and Corrupt

_____

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

Organizations Act ("RICO") claims. These claims are premised upon alleged misrepresentations made by defendant A.O. Smith Harvestore Products, Inc., a subsidiary of defendant A.O. Smith Corporation (collectively "AOSHPI"), and AOSHPI's authorized local dealer, MVBA Harvestore Systems, concerning a Harvestore silo that the Klehrs purchased. The district court ruled that the Klehrs' claims were barred by the statute of limitations. Klehr v. A.O. Smith Corp., 875 F. Supp. 1342 (D. Minn. 1995). We affirm.

I.

The Klehrs operate a dairy farm in Minnesota. In approximately 1974, they purchased a Harvestore silo manufactured and marketed by AOSHPI and sold by MVBA. Richard Deutsch, a salesman for MVBA, provided the Klehrs with information about Harvestore silos before and after the Klehrs purchased the Harvestore, and he also served as their local contact when they had problems with the unit.

The fulcrum for the Klehrs' claims relates to certain representations made by AOSHPI concerning a Harvestore silo's unique "oxygen limiting" feature. Marvin Klehr was an experienced dairy farmer and knew that mold and spoilage in livestock feed are caused due to the feed's exposure to oxygen, and that moldy and spoiled feed would be harmful to his dairy herd if fed to it. According to the Klehrs, AOSHPI represented that because the Harvestore silos were sealed, feed stored in the unit would have almost no exposure to oxygen, thereby virtually eliminating problems with moldy or spoiled feed.[2] This would result in higher feed quality, which in turn would eliminate the need to add protein supplements to the herd's daily feed ration. It would also improve

---

[2]Some of AOSHPI's promotional materials apparently likened a Harvestore silo to a giant sealed fruit jar.

the health of the herd and increase milk production at a rate of three to five pounds of milk per cow per day. All of these purported benefits would ultimately increase the profitability of the Klehrs' dairy operation. Although a Harvestore silo was considerably more expensive than a conventional stave silo, which the Klehrs also considered purchasing, it was explained to the Klehrs that Harvestore's unique "oxygen limiting" feature justified the higher cost of the unit and that the unit would pay for itself in four to five years. The Klehrs recognized, however, that all of the promised virtues of a Harvestore unit hinged upon the efficacy of the structure's "oxygen-limiting" feature.

Despite AOSHPI's representations, the Klehrs experienced a myriad of problems after the Harvestore unit was installed. In July and August of 1976, Marvin Klehr observed white chunks of mold in the haylage[3] he removed from the unit. He contacted Deutsch, who assured him that the mold was normal and simply the product of a minute quantity of oxygen that entered the top hatch of the unit when it was being filled.[4] Deutsch explained that the Klehrs could expect a thin layer of mold each time the Harvestore was filled because of the small amount of oxygen that would flow into the unit during the filling process. The Klehrs accepted this explanation.

In the spring of 1977, Marvin Klehr again noticed chunks of mold in the feed and also observed that the feed had become unusually dark brown and smelled musty. Marvin Klehr loaded the spoiled feed into a manure spreader and dumped it on one of his

---

[3]"Haylage" in the context of this case refers to chopped alfalfa silage stored in a silo at a designated moisture content to promote fermentation.

[4]A Harvestore silo is filled through an open hatch at the top of the structure and unloaded by way of a chain-type unloader at the bottom of the unit. During the unloading process, so-called "breather bags" at the top of the silo expand to prevent oxygen from entering.

fields.  Marvin Klehr made the same observations in the spring of 1978 and undertook the same action.  This process was repeated each spring, with the amount of moldy or spoiled feed always ranging from one to two manure spreader loads.[5]

The Klehrs' dairy herd also began suffering from various health problems after the Klehrs started feeding the herd haylage stored in the structure.  Some of the health problems had not previously afflicted the herd, while other maladies began occurring with much greater frequency.  These ailments included: displaced abomasums or "twisted stomachs," "foot problems," swelling and bruises around the joints in the cows' hind legs, cows "going off feed," unusually thin and unthrifty cows, cows having rough hair coats and dull eyes, a higher rate of uterine infections, and more diarrhea and digestive problems than normal.  Further, the Klehrs' herd began having certain breeding and reproductive problems, such as poor conception rates, longer calving intervals, and spontaneous abortions.

Additionally, the Klehrs never realized the numerous benefits AOSHPI represented the Harvestore unit would provide, namely, an increase in milk production, elimination of protein supplements, and ultimately, an increase in profitability of the dairy operation.  In fact, although their dairy operation had been profitable prior to their purchase of the Harvestore, the Klehrs

---

[5]The only exception to this process was that in approximately the spring of 1982, Marvin Klehr noticed a much greater quantity of moldy and spoiled feed than he had previously observed.  The feed was much darker brown and contained significantly more and larger chunks of mold.  He immediately ceased feeding his dairy herd feed from the Harvestore unit and subsequently emptied approximately 12 manure spreader loads of spoiled feed from the unit.  Deutsch and AOSHPI officials later made repairs to the unit.  Thereafter, the process returned to what it had previously been -- one to two manure spreader loads of spoiled or moldy feed emptied from the unit each spring.

experienced financial hardship after they started using the Harvestore. Despite all of this, the Klehrs never questioned Deutsch about the inability to eliminate protein supplements or the lack of increase in milk production or profitability until 1990. The Klehrs did consult a number of nutritionists and veterinarians during the years after they purchased the Harvestore concerning several of the herd's health and reproductive problems, but they never asked these consultants whether the Harvestore could have been the source of the problems. Finally, the Klehrs did not examine records which they possessed which would have illustrated to them that their herd's milk production was below that of other local herds and that the herd's milk production and the profitability of the dairy operation had not increased since the Harvestore was installed.

In 1991, Marvin Klehr saw an article in a Minneapolis, Minnesota, newspaper regarding a claim concerning a Harvestore unit that had been made against AOSHPI in Minnesota state court. Marvin Klehr subsequently contacted a University of Minnesota veterinarian, Dr. William Olson, about a health problem with his herd; in April of 1991, Dr. Olson visited the Klehrs' farm. Dr. Olson and Marvin Klehr subsequently looked inside the Harvestore and observed large amounts of moldy and spoiled feed. This was the first time that Marvin Klehr had looked inside the Harvestore unit when feed was still being stored in the unit.

The Klehrs later commenced this action on August 27, 1993, alleging Minnesota common law fraud and negligent representation claims, violations of certain Minnesota consumer statutes, and violations of RICO. AOSHPI moved for summary judgment on each claim arguing, inter alia, that the claims were barred by the statute of limitations. The district court granted AOSHPI's motions. Klehr, 875 F. Supp. at 1345. The Klehrs appeal.

II.

We review <u>de novo</u> the district court's grant of summary judgment. <u>Maitland v. University of Minn.</u>, 43 F.3d 357, 360 (8th Cir. 1994). Summary judgment is appropriate if the record, when viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

A.

We turn our attention first to the Klehrs' Minnesota common law fraud claims, which are governed by a six-year statute of limitations. <u>See</u> Minn. Stat. Ann. § 541.05(6) (West 1988).[6] Under this statute, the cause of action accrues, thereby triggering the limitations period, upon "the discovery by the aggrieved party of the facts constituting the fraud." <u>Id.</u>

The Minnesota Supreme Court has construed this statute as imposing a standard of objective reasonableness upon a plaintiff to discover the facts constituting the fraud. <u>Bustad v. Bustad</u>, 116 N.W.2d 552, 555 (Minn. 1962). "[T]he facts constituting the fraud are deemed to have been discovered when, with reasonable diligence, they could and ought to have been discovered." <u>Blegen v. Monarch Life Ins. Co.</u>, 365 N.W.2d 356, 357 (Minn. Ct. App. 1985) (quotations omitted). "A plaintiff must exercise reasonable diligence when he or she has notice of a possible cause of action for fraud." <u>Buller v. A.O. Smith Harvestore Prods., Inc.</u>, 518 N.W.2d 537, 542 (Minn. 1994). A "`party need not know the details of the evidence establishing a cause of action, only that the cause

---

[6]With respect to these claims, we review <u>de novo</u> the district court's interpretation of Minnesota law. <u>Michalski v. Bank of America Arizona</u>, 66 F.3d 993, 995 (8th Cir. 1995).

-6-

of action exists'" in order for the limitations period to commence.  Id. (quoting Hydra-Mac, Inc. v. Onan Corp.,     450 N.W.2d 913, 919 (Minn. 1990)).   A failure to actually discover the fraud will not toll the limitations period if such a failure is inconsistent with this reasonable diligence standard.  Blegen, 365 N.W.2d at 357.

The Klehrs bear the burden of showing that they did not, and that with reasonable diligence they could not, discover the facts constituting the fraud earlier than August 27, 1987, six years prior to the time this action was filed.  Id.  A plaintiff's due diligence in the statute of limitations context is ordinarily a question of fact.  Hines v. A.O. Smith Harvestore Prods. Inc., 880 F.2d 995, 999 (8th Cir. 1989).  Where the evidence leaves no room for reasonable minds to differ on the issue, however, the court may properly resolve the issue as a matter of law. Miles v. A.O. Smith Harvestore Prods., Inc., 992 F.2d 813, 817 (8th Cir. 1993).

The Klehrs argue that they did not become aware of the facts constituting the fraud until April of 1991, when Marvin Klehr, accompanied by Dr. Olson, looked inside the silo for the first time during feed storage and observed large amounts of mold in the feed.  The Klehrs submit that they questioned Deutsch about the presence of mold and spoilage in the feed and that at various times they consulted numerous veterinarians and nutritionists concerning the health and reproductive problems that their dairy herd was experiencing.  Based on these actions, the Klehrs assert that a fact question exists concerning whether they exercised reasonable diligence to determine the facts constituting the fraud.  We disagree.

Shortly after they began using the Harvestore unit to store haylage, the Klehrs encountered problems that were directly contrary to AOSHPI's representations concerning the benefits a Harvestore unit would provide. AOSHPI represented to the Klehrs

that using a Harvestore to store feed for their dairy herd would virtually eliminate problems with moldy and spoiled feed.  However, beginning in July of 1976 and continuing each subsequent year, Marvin Klehr observed mold in the feed which had been extracted from the unit; further, beginning in the spring of 1978, Marvin Klehr annually emptied one to two manure spreader loads of moldy or spoiled feed from the unit.  Further, contrary to AOSHPI's representations of improved herd health, herd health actually deteriorated.  The herd also began experiencing heretofore unencountered breeding and reproductive problems.  The Klehrs consulted with a number of nutritionists and veterinarians over the years, but they never asked any of these consultants whether the feed fed from the Harvestore silo could have been the source of the herd's health and reproductive problems.

Similarly, it was represented to the Klehrs that one of the chief virtues of a Harvestore was that it would dramatically improve the quality of the feed such that protein supplements would become unnecessary; the Klehrs, however, were never able to reduce or eliminate protein supplements to the herd's daily feed ration.  In addition, promises of increased milk production and profitability of the dairy operation went unfulfilled; in fact, while the Klehrs' dairy operation had been profitable prior to the purchase of the Harvestore, thereafter the Klehrs experienced financial hardship because the dairy profits were not large enough.  The Klehrs failed to examine records in their possession which would have indicated to them that the Harvestore unit was not delivering the promised increases in milk production and profitability, and that the herd's milk production was subpar compared to other local dairy herds.  The Klehrs did not question Deutsch or AOSHPI officials until 1990, some 16 years after putting the Harvestore to use, about the lack of an increase in milk production and profitability of the dairy operation, and the

inability to eliminate protein supplements from the herd's daily feed ration.

The Klehrs assert that health or reproductive problems in a dairy farming operation can be caused by a myriad of factors inherent in dairy farming and therefore determining the precise source of the problem is impossible. Setting aside the other promised benefits concerning the Harvestore which never came to pass (moldy and spoiled feed, inability to eliminate protein supplements), in this case the Klehrs' herd suffered numerous health and reproductive problems shortly after the Klehrs started to feed the herd haylage stored in the Harvestore unit. After encountering these problems, the Klehrs were on notice of a possible cause of action for fraud and were required to conduct a reasonably diligent investigation -- perhaps by inspecting the silo during feed storage (which they did for the first time in 1991 and observed the prevalence of mold), by questioning Deutsch or AOSHPI representatives concerning why the dairy operation was not profitable, or by asking a veterinarian or nutritionist whether the Harvestore could be the source of the problems. Their failure to do so is simply inconsistent with Minnesota's inquiry notice standard, under which plaintiffs are required to exercise reasonable diligence to discover the facts which may constitute the fraud. We hold that, as a matter of law, the Klehrs, by exercising reasonable diligence, should have discovered the facts constituting the alleged fraud prior to August 27, 1987.

This case is distinguishable from our holding in Hines, where we were called upon to decide whether the Missouri statute of limitations barred the plaintiffs' common law fraud claims in connection with several Harvestore silos. 880 F.2d at 995. We held in Hines that a factual dispute existed concerning when the plaintiffs' cause of action accrued under Missouri law because there was a conflict in the evidence concerning when the plaintiffs

-9-

should have known that the Harvestore silos were not operating as AOSHPI represented.  <u>Id.</u> at 998.  Notwithstanding <u>Hines</u>, our analysis in this case, which concerns Minnesota state law claims, is governed by the teachings of the Minnesota Supreme Court concerning the interpretation and application of that state's discovery accrual rule; of particular import is that court's recent decision in <u>Buller</u>, which, like this case, involved the application of the statute of limitations involving a claim of fraud in connection with a Harvestore silo.  Our analysis is also guided by the Minnesota federal district court's holding in <u>Veldhuizen</u>, wherein that court addressed the precise issues in front of us in another case involving a Harvestore silo.  The analysis expounded in these cases makes clear that the Klehrs' cause of action accrued long before August 27, 1987.  Thus, our <u>Hines</u> decision, in which we were called upon to interpret Missouri's discovery rule, is not controlling here.

In any event, to the extent that <u>Hines</u> applies, there we relied upon evidence that water had leaked into the Harvestore due to cracks in the structure and had possibly come into contact with the feed stored within; thus, the plaintiffs would have been unable to determine whether the silo, if it had been properly sealed, nevertheless could not live up to AOSHPI's representations that moldy and spoiled feed would be eliminated.  The Klehrs, however, have made no similar showing that their silo had cracks that may have permitted water to come into contact with the stored feed, and which would create a question of fact as to the cause of the moldy or spoiled feed.[7]

---

[7]Both parties cite a number of cases from other jurisdictions dealing with the Harvestore litigation.  <u>See, e.g.</u>, <u>Horn v. A.O. Smith Corp.</u>, 50 F.3d 1365 (7th Cir. 1995); <u>Mohr v. A.O. Smith, et al.</u>, 1994 WL 178111 (E.D. Mich.); <u>Nelson v. A.O. Smith Harvestore Prod., Inc.</u>, No. 86-4230-R (D. Kan. 1990); <u>Johnston v. AgriStor Credit Corp.</u>, Civ. No. 84-4421-S (D. Kan. 1987).  While we find the analysis of these courts to be somewhat helpful, again our
analysis is governed by the Minnesota Supreme Court's interpretation of Minnesota's discovery accrual rule applicable to fraud claims.

The Klehrs also contend that the statute of limitations did not commence until they were aware that the Harvestore unit had a design defect that prevented it from performing as represented. Such a standard, however, is wholly inconsistent with the Minnesota Supreme Court's teaching that the requirement of reasonable diligence imposes an affirmative duty to investigate upon a party who is aware of facts that might constitute a possible cause of action for fraud. Buller, 518 N.W.2d at 542; Hydra-Mac, 450 N.W.2d at 919 ("A party need not know the details of the evidence establishing the cause of action, only that the cause of action exists."). We find persuasive the following statement from Veldhuizen, where the court addressed this precise issue: "The limitations period does not wait to run until the [plaintiffs] were able to make a causal connection between the failure of the silo to perform as promised and a particular design defect." Veldhuizen v. A.O. Smith Corp., 839 F. Supp. 669, 676 (D. Minn. 1993). Thus, we reject the Klehrs' argument that the limitations period did not commence until they were able to pinpoint the design flaw that prevented the Harvestore from performing as represented.[8]

---

[8]Likewise, we reject as meritless the Klehrs' assertion that their "failure to realize non-actionable predictions of future performance" did not trigger the statute of limitations. (Klehrs' brief at 21.) The problems the Klehrs actually experienced shortly after they started using the Harvestore should have put them on notice that AOSHPI's representations concerning the unit were false, regardless of whether other performance benefits would have been independently actionable. While the Klehrs may not have been required to immediately file suit when they realized the representations were not true, they were required to conduct a reasonable further investigation, which, as we have outlined in detail, they failed to do.

The Klehrs contend that AOSHPI fraudulently concealed their fraud cause of action and therefore the statute of limitations should be tolled. "Fraudulent concealment `tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect.'" Buller, 518 N.W.2d at 542 (quoting Hydra-Mac, Inc., 450 N.W.2d at 918). The limitations period is tolled, however, "only if it is the very existence of the facts which establish the cause of action which are fraudulently concealed." Hydra-Mac, Inc., 450 N.W.2d at 918-19. "Merely establishing that a defendant had intentionally concealed the alleged defects is insufficient; the claimant must establish that it was actually unaware that the defect existed before a finding of fraudulent concealment can be sustained." Id. Further, "`there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action'" for fraudulent concealment to apply. Wild v. Rarig, 234 N.W.2d 775, 795 (Minn. 1975) (quoting 54 C.J.S. Limitations of Actions § 206f). The Klehrs bear the burden of showing that AOSHPI concealed the fraud and that the concealment itself could not have been discovered sooner by exercising reasonable diligence. Buller, 518 N.W. 2d at 542-43.

The Klehrs contend that material fact issues remain concerning whether AOSHPI knew that the Harvestore silos were defective and deliberately concealed the defects from them through oral representations, written materials sent to Harvestore owners, and promotional meetings which the Klehrs attended. The Klehrs also contend that suggestions made by Deutsch and representatives of AOSHPI concerning methods to improve the dairy operation served to conceal the defects from them. According to the Klehrs, these misrepresentations prevented them from discovering the fraud, and

accordingly the statute of limitations should be tolled during the period these continuing misrepresentations were made.

These arguments are unpersuasive quite simply because the Klehrs have made no showing that AOSHPI affirmatively concealed from them the existence of facts which would have supported their cause of action for fraud. As chronicled in detail above, the Klehrs were aware as early as 1976, when Marvin Klehr saw mold in feed taken from the Harvestore, that the silo was not performing as promised. The oral and written representations the Klehrs rely on to support their fraudulent concealment argument did not, and indeed could not, prevent them from discovering that AOSHPI's promises concerning the virtues of a Harvestore unit did not come to pass. <u>See</u> <u>Miles</u>, 992 F.2d at 816 (rejecting claim of fraudulent concealment in connection with Harvestore because of impossibility for defendants to conceal facts giving rise to cause of action when the evidence was in the plaintiff's own yard); <u>Veldhuizen</u>, 839 F. Supp. at 675 ("providing the [plaintiffs] with the post-sale materials does not rise to the level of affirmative concealment necessary to toll the statute of limitations."). <u>Id.</u> <u>See</u> <u>also</u> <u>Buller</u>, 518 N.W. 2d at 543 (rejecting fraudulent concealment claim based on post-sale advertising materials because plaintiff knew that Harvestore was not performing as represented). In short, the Klehrs' lack of diligence precludes us from tolling the statute of limitations due to fraudulent concealment.[9]

---

[9]We likewise reject the Klehrs' claims that, in the alternative, AOSHPI is equitably estopped from asserting the statute of limitations because of the repairs that were made to the Harvestore silo in approximately 1982. There is no evidence that AOSHPI represented that these repairs would cure the myriad of problems outlined above that the Klehrs had been experiencing. In any event, the Klehrs admit that after the repairs were made the same problems which they previously experienced continued. Thus, equitable estoppel is inapplicable in this case.

III.

The Klehrs argue that the district court erred by holding that their civil RICO claims were barred by the statute of limitations. Civil RICO claims are governed by a four-year statute of limitations. Association of Commonwealth Claimants v. Moylan, 71 F.3d 1398, 1402 (8th Cir. 1995). This circuit employs a discovery accrual standard to civil RICO claims; under this standard, such an action begins to accrue "as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." Id. (inner quotes omitted)[10] The date when the injury and the pattern should have been discovered is subject to a standard of reasonableness, id., not unlike the standard for fraud claims outlined above. Thus, it is incumbent upon the Klehrs to show that it would not have been reasonable to discover the existence, source, and pattern of their injury by August 27, 1989.

The Klehrs' RICO claims are premised on allegedly fraudulent advertising and promotional materials that they received through the mail from AOSHPI on a continuous basis before and after they purchased the Harvestore. The Klehrs claim that AOSHPI distributed similar materials to individuals throughout the United States during this period. They contend that these materials made the same fraudulent misrepresentations concerning the attributes and the benefits of Harvestore silos that they relied on in deciding to purchase their unit.

---

[10]The Klehrs assert a claim under 18 U.S.C. § 1962(a) for injury resulting from the reinvestment of income from the RICO enterprise in addition to their claim under 18 U.S.C. § 1962(c) based on a pattern of racketeering activity. The Klehrs contend that both claims are governed by the same discovery accrual rule, and we will assume, without deciding, that the same accrual rule applies to both causes of action.

-14-

However, we agree with the district court that the facts which should have put the Klehrs on notice of a possible cause of action for fraud should also have alerted them to the existence, source, and pattern of the injury for their RICO claim.  As noted above, the Klehrs knew or should have known shortly after purchasing the Harvestore that AOSHPI's representations concerning the silo's attributes were simply not coming true and thus should have recognized the existence and source of their injury.  Likewise, given that the Klehrs received numerous promotional materials and advertisements in the mail before and after they purchased the silo, they should have known that the misrepresentations were part of a pattern of suspected racketeering activity.  We believe that the Klehrs should have determined that the representations were part of a pattern of racketeering activity when they should have identified the Harvestore as the cause and source of their problems.  See Agristor v. Financial Corp. v. Van Sickle, 967 F.2d 233, 241-42 (6th Cir. 1992) (stating in analogous case that "as a matter of law, [the plaintiff] should have determined that the representations were part of a pattern at the same time it should have discovered that the silos caused the alleged problems on the dairy farm.").

The Klehrs urge us to adopt "a separate accrual rule," which would permit them to recover damages for predicate acts that occur within the limitations period, even if their claim for similar damages caused by similar predicate acts outside of the four-year period are time-barred. In essence, then, the Klehrs request that we adopt the "last predicate act" accrual rule outlined by the Third Circuit in Keystone v. Houghton, 863 F.2d 1125, 1126 (3d Cir. 1988), or a variation thereof.  However, in Granite Falls Bank v. Henrikson, 924 F.2d 150, 154 (8th Cir. 1991), we declined to adopt such an "open-ended" standard, observing that it was inconsistent with "the underlying policy of a statute of limitations requiring due diligence on the part of the plaintiff."  924 F.2d at 154.

-15-

Instead, we adopted an approach under which a plaintiff has four years to bring his claim from the point in time that he knew, or in exercising reasonable diligence should have known, of the existence and source of his injury and that the injury was part of a pattern, or his RICO claims are forever barred.  Id.  The principles expounded in Granite Falls preclude us from adopting the standard that the Klehrs propose.

We likewise reject the Klehrs' related assertion that their RICO claims are revived because of the "continuing damage" they sustained into the limitations period through the continued use, operation, and repair of the Harvestore silo.  Again, Granite Falls provides the governing principle: it makes clear that a civil RICO action accrues with respect to "each independent injury" to the plaintiff.  924 F.2d at 154.  The Klehrs would have us hold that each advertisement or promotional material that was sent to them or that they observed constitutes a separate "injury." However, these injuries are not "independent injuries" because they are all of the same type, flow from the same source, and are part of one cognizable pattern of conduct -- AOSHPI's alleged misrepresentations regarding the Harvestore unit.  We believe that these separate, discrete "injuries" that the Klehrs identify are more appropriately categorized as one single, continuous injury that was sustained sometime in the 1970s and for which the limitations period commenced long before August 27, 1989.  See Glessner v. Kenny, 952 F.2d 702, 708 (3d Cir. 1992) ("the mere continuation of damages into a later period will not serve to extend the statute of limitations.").  Thus, the Klehrs' civil RICO claims are time-barred.[11]

---

[11]We reject the Klehrs' argument that federal equitable tolling principles save their claim from being barred by the statute of limitations.  The Klehrs' failure to act with due diligence precludes the application of this doctrine.  See Johnson v. United States Postal Service, 861 F.2d 1475, 1481 (10th Cir. 1988), cert. denied, 493 U.S. 811 (1989).  See also Wilson v. United States Government, 23 F.3d 559, 561 (1st Cir. 1994) ("[f]ederal courts have allowed equitable tolling only sparingly.").

IV.


We have examined the Klehrs' numerous other arguments and determine that they lack merit for the reasons given by the experienced district judge in his well-reasoned opinion.  Accordingly, for the reasons enumerated above, we affirm the district court's grant of summary judgment to AOSHPI.


A true copy.


Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.